(68 South. 201)

No. 20553.

PONS et al. v. PONS

(April 27, 1914. On the Merits, Nov. 30, 1914. On Rehearing, April 26, 1915.)

*(Syllabus by Editorial Staff.)*

1. INSANE PERSONS ☞30 — INTERDICTION — PERSONS LIABLE—"INCAPABLE OF ADMINISTERING THEIR ESTATES."

As used in Rev. Civ. Code, art. 422, providing that all persons who are "incapable of administering their estates" shall be liable to be interdicted, the words quoted, however definite and fixed their meaning in the abstract, become elastic and relative when applied to some particular state of facts; there being kinds and degrees of incapacity, some of which do not fall within such article.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. §§ 43, 45, 61; Dec. Dig. ☞30.]

*(Syllabus by the Court.)*

On Rehearing.

2. INSANE PERSONS ☞30 — INTERDICTION — JUDGMENT.

The law declares that "No person above the age of majority, who is subject to an habitual state of imbecility, insanity or madness, shall be allowed to take care of his own person and administer his own estate, although such person shall, at times, appear to have the possession of his reason," and that "Not only lunatics and idiots are liable to be interdicted, but, likewise, all persons who, owing to any infirmity, are incapable of taking care of their persons and administering their estates," and that, "Such persons shall be placed under the care of a curator," etc. Hence, in a suit for interdiction, where the defendant is found to have been insane when the suit was brought, and to have so continued, the necessity for the interdiction arises from the obligation imposed on the court to comply with the law, and there should be judgment accordingly.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. §§ 43, 45, 61; Dec. Dig. ☞30.]

3. INSANE PERSONS ☞2—INTERDICTION—EVIDENCE.

Though the question to be determined, in a proceeding for interdiction, be whether the defendant was sane or insane when the proceeding was instituted, the evidence should not be confined to that moment, since light may be thrown upon such question by information as to defendant's mental condition, on the day before, or at some other time, in the past, or as to his heredity; but the inquiry for such information should be confined within reasonable limits, depending on the character of the case.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. §§ 4–10; Dec. Dig. ☞2.]

4. INSANE PERSONS ☞33—INTERDICTION—APPEAL—EXCLUSION OF EVIDENCE—EXPENSES.

Where, in a suit for interdiction, because of alleged senile dementia, the existence of the malady is shown by the testimony of specialists and other medical practitioners, based upon information obtained, for the most part, through examinations made several months after the filing of the suit; but all testimony as to defendant's condition, prior to the filing of the suit, is excluded, as irrelevant; and an offer is made to show, by numerous witnesses, that up to the filing of the suit defendant was competent to, and actually did, take care of her person and property, and appeared to be sane and normal, the case will be remanded in order that the excluded testimony, concerning defendant's condition, of those who saw and dealt with her during the period anterior to the filing of the suit, may be weighed with the deductions, as to that condition, of those who had not seen her, but predicated those deductions upon her condition as they found it after the filing of the suit; for, though the interdiction must eventually be pronounced, it becomes important, where heavy expenses have been incurred, to ascertain whether a sufficient cause existed when the suit was filed, or whether it arose at a later period, and whether the mental shock, resulting from the suit, had the effect of developing, or making apparent, that which otherwise might have remained undeveloped and nonapparent.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. §§ 44–46, 48, 50, 51, 59; Dec. Dig. ☞33.]

O'Neill, J., dissenting.

*(Additional Syllabus by Editorial Staff.)*

5. INSANE PERSONS ⬤⇒30 — INTERDICTION — "IMBECILITY, INSANITY, OR MADNESS."

As used in Rev. Civ. Code, art. 389, providing that no person above the age of majority who is subject to an habitual state of "imbecility, insanity or madness" shall be allowed to take care of his own person and administer his estate, though at times in apparent possession of his reason, the words quoted are translations of "d'imbécilité, de demence ou de fureur," found in French text of the Codes of 1808 and 1825, and are the identical words of Code Napoleon, art. 489, which are held by the French commentators to be declaratory of what is, in reality, the one ground of interdiction, to wit, mental alienation consisting of absence of, or change in, the faculty of reasoning and discerning, and which renders the person incapable of taking care of himself and administering his affairs.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. §§ 43, 45, 61; Dec. Dig. ⬤⇒30.]

Appeal from Civil District Court, Parish of Orleans; T. C. W. Ellis, Judge.

Action by Josephine Pons, wife of Salvadore Ruiz, and others against Marie Madeline Pons, widow. From judgment for defendant, plaintiffs appeal. Remanded.

Lazarus, Michel & Lazarus, of New Orleans (W. S. Parkerson, of New Orleans, of counsel), for appellants. P. L. Fourchy and Woodville & Woodville, all of New Orleans, for appellee.

On Motion to Dismiss Appeal.

PROVOSTY, J. Nothing showing that the American Surety Company of New York, surety on the appeal bond, had qualified, under Act 41, p. 45, of 1894, and Act 71, p. 185, of 1904, to do business in this state, motion was made to dismiss the appeal for want of a proper bond; but on certiorari the proper proof of such qualification has now been furnished, and hence, the said motion to dismiss must be overruled.

The motion to dismiss the appeal is overruled.

On the Merits.

This suit is for the interdiction of Mrs. Marie M. Pons. It is brought by four of her five daughters, who with one other daughter and a grandson are her only presumptive heirs. This other daughter, Mrs. Suarez, has been living with her, and sides with her in this controversy. The grandson sides with the plaintiffs. The reasons for judgment of the learned trial judge were as follows:

"A suit to interdict is a matter of serious concern, almost capital in its nature. Its effect, if there be judgment of interdiction, is to strike down the interdict as a free agent, and to enroll him as one civiliter mortuus.

"For a person who has had the free enjoyment of his home, his freedom of action, and the right to use and enjoy his estate at his will to be deprived of all this, and in his person and his property to be subjected to the will and the keeping of another, is about as great a calamity as can befall a human being.

"And yet sometimes, for the well-being of society, as well as of the individual himself, the law declares there shall be interdictions, as in the case of the idiot, the lunatic, and the madman.

"There are cases of absolute mental disorder by reason of which the victim may not only be incapable of caring for himself or his estate but may be a menace to himself or to others.

"As to all such persons, the direction of the law is absolute, that they shall be interdicted. R. C. C. 389.

"It is not pretended that the instant case falls in this class.

"There is another class of unfortunates, 'liable to interdiction,' i. e., those who, 'owing to any infirmity,' are incapable of caring for themselves or their property. R. C. C. 422.

"As to this class, jurisprudence has fixed the essential requirements for the decree of interdiction, to wit:

"'First. The undoubted incapacity to administer one's estate.

"'Second. The absolute inability to care for one's person.

"'Third. An actual and unavoidable necessity for the interdiction.'

"'Francke v. Francke, 29 La. Ann. 302; Interdiction of Watson, 31 La. Ann. 759.

"In each of these reported cases, the Supreme Court found that the defendant was incapable of caring for property or person, by reason of mental infirmity.

"In the former case, Mrs. Francke, a wife and mother, past middle life, evidently insane, was in the care of her mother where she was happy and contented.

"In the latter, the defendant Watson was a youth, insane, violent at times, and an utter incapable, but he was in the keeping of his mother and sister, who were able to control, and take care of him.

"In both of these cases, the Supreme Court, holding that the personal interest and comfort

of the defendant were the primary consideration, refused the interdiction, upon the ground that there was no actual and unavoidable necessity therefor.

"These decided cases are well bottomed on R. C. C. 229, which lays down the reciprocal duties of parents and children to take care of each other, and declares in its last paragraph that 'they are bound to render reciprocally all the services which their situation can require, if they should become insane.'

"The rule of law resulting from these authorities is that, in case of insanity, where the condition of the patient is such as not to endanger himself or to injure others, the home life and family care and control will be preserved, and a curator will not be appointed.

"Under these rules, it is to be determined whether the defendant, Mrs. Pons, should be interdicted.

"Her interdiction is demanded by four of her five living children on two grounds, to wit:

"First. That by reason of extreme old age and physical and mental disability, she is unable to care for her person, or her estate.

"Second. That as the result of a conspiracy between her fifth child Mrs. Suarez and P. L. Fourchy, she is completely under their control; that the latter holds her unlimited power of attorney; that she has made a will favorable to them, and prejudicial to plaintiffs; that her estate has been wasted, her property mortgaged heavily; that she is being neglected; and that, through her interdiction, they hope to prolong her life, render her happy, and have her estate so administered that she may be comfortably provided for.

"At the trial, the plaintiffs offered no proof of their allegations referred to second, above. And when defendant tendered evidence to prove that there had been no conspiracy between Mrs. Suarez and Mr. Fourchy; that there had been no maladministration or waste of her estate; that she had not been neglected; that prior to the filing of the interdiction suit she had managed her own affairs in all important matters, including the mortgage—the plaintiffs objected that they had brought no evidence on these subjects; that they had limited their evidence, confining it to defendant's physical and mental condition, at the date of the institution of their suit for her interdiction and since that date, and therefore there was nothing offered by plaintiffs, on these subjects, to be rebutted.

"As this was true, the objection was sustained.

"It thus appears that plaintiffs have abandoned all their charges of conspiracy, maladministration, and waste of defendant's estate.

"First. By offering no proof to support them.

"Second. By objection to evidence offered by defendant, to disprove plaintiffs' allegations.

"It follows, by this action of the plaintiffs, that there is no issue of fact left in the case, except as to the mental and physical condition of defendant, at the date when this suit was brought, and since.

"Thus narrowed by the plaintiffs, the question presented is whether Mrs. Pons, the defendant, is, by reason of her physical and mental infirmity, unable to care for her person and her property; and, this fact conceded, for unquestionably it is true, the only remaining issue of fact, is whether there is 'an actual, and unavoidable necessity for her interdiction.'

"To answer this question it is necessary to know who is the defendant, Mrs. Pons, and what is her condition, and what were the circumstances and the situation in which she was found when this suit was brought, and what are they now?

"The questions are easily answered.

"Mrs. Pons is something over 70 years of age.

"Her husband died years ago. Of her marriage were born her four daughters, the plaintiffs, a son who died in childhood, a son who married and died, leaving one child, Walter Pons, and, lastly, Mrs. Antoinette Suarez, her daughter, who, though married, has never left her mother, and who still lives with her, in all, seven children.

"That she has been an affectionate and dutiful mother to all of them the plaintiffs do not deny.

"Some years ago she came into a fortune, consisting mainly of real estate, estimated now at near $340,000, situated in this city. She owns her residence, a beautiful home on Esplanade street, with ample grounds and appurtenances, a large two-story house, handsomely furnished, and with everything needed for the comfort and convenience of herself, and her household.

"Living there with her, when this suit was brought, were her daughter Mrs. Suarez and husband Mr. Suarez and their adopted child, and her grandson, Walter Pons.

"Her native tongue is the Spanish, though she understands the English language and speaks it fairly well. Her articulation is not distinct, owing perhaps to her loss of her teeth, and she has a nervous affection of the neck and face that, in conversation, puts her at a disadvantage.

"She is inclined to corpulency, and when this suit was brought had suffered, for some time, with incontinence of bowels and kidneys, and with lameness to some extent, though able to walk around the house and to and from her carriage.

"Her recreation was daily driving around the city in a carriage, and for this purpose she kept a driver, carriage, and horse.

"She was and still is social in her nature, fond of receiving and entertaining her friends and kindred, loved the association and gaiety of the young, loved music and the dance, was especially fond of flowers, taking interest in their culture. She is cordial and gracious in manner, has a kind heart and gentle disposition. She had not the advantage of early education. Her grandson, Walter Pons, she had raised from a child, and he was her special pet. Her daughter, Mrs. Suarez, her youngest, has

lived with her always, except for a short time after her marriage, and was and still is her housekeeper and constant companion and attendant. That she and her mother are devoted to each other, and that this daughter has cared for her mother and ministered in every way to her comfort, there can be no doubt.

"Her income was derived from the rents of her real estate. She had an agent, with full power of attorney, who saw to the renting of her properties, but she kept her bank account, receiving her money, signing checks, etc. Against the fidelity and honesty of this agent in his dealings with Mrs. Pons there is not a word of proof. In this litigation, he has proved his devotion to her. No one could have served her with greater zeal or industry.

"This was her situation and condition at the date when this suit was instituted.

"She was an old woman, feeble in body, and weak-minded, unable, if left to herself, to care for her person or her property, but she had ample property and income, a comfortable home, the care and companionship of a devoted daughter, and an agent to look out for her business affairs. That she was well cared for and enjoyed life as well as any one of her age and infirmities could, and was contented and happy, there is, in my mind, no shadow of doubt.

"It seems to me, after careful and conscientious study of all the evidence, and of all the facts that are apparent and speak for themselves without evidence, that all the testimony given by the plaintiffs, and the testimony and opinions of the learned physicians, who testified as experts, may be accepted as true, and that still there is an utter failure to show an 'actual and unavoidable necessity for defendant's interdiction.'

"But there are facts and circumstances that, when understood, must diminish by very much the weight to be given to the opinions of the physicians, as tests of defendant's ordinary normal condition.

"Of the integrity, learning, and high character of these physicians there can be no question, but the fact remains that they saw and examined and questioned defendant, under circumstances that were most unfavorable to her.

"They first saw Mrs. Pons after this suit had been brought.

"Without any warning to defendant, service of the petition and citation had been made on her by the sheriff. Then came the notary public and two appraisers, passing through all the apartments of her home examining, listing, and valuing her furniture and personal effects, and then came the notice that an administrator pro tempore had taken from her all control of her properties.

"That this feeble-minded and feeble-bodied old lady was worried and depressed is well proved by reliable witnesses. She knew that something was in operation against her to change the condition of her life. And it was under this condition of apprehension and dread and depression that the learned experts came, to add to her discomfort and her fears by their professional examination of her personally, and by the questions that they propounded to her, as to herself, her family history, her properties and their revenues, etc., all with the view of testing her sanity.

"They were utter strangers to her, and spoke to her in a language that was not her native tongue, and notes were kept as her answers were given.

"Can any one doubt that under such circumstances this depressed and nervous old lady, physically and mentally, was at her very worst?

"So much for the circumstances under which the experts first saw and examined the defendant. On January 15, 1913, defendant's answer, verified by her personal affidavit, was filed.

"A reputable attorney and notary, Mr. Gautier, who took her affidavit and signature, testified on the trial that defendant seemed to him in her right mind, declaring that she understood what she was doing.

"It is shown that after the shock, produced by the suit had worn off, defendant began to improve, and soon resumed her accustomed daily carriage drives. On February 18, 1913, she returned in the afternoon from a drive of several hours' duration fatigued, and intending to enter her house.

"When her daughter had left the carriage, and defendant was in the act of alighting from it, Walter Pons, pistol in hand, compelled her to remain, and with threats of shooting, forced the colored driver to convey them to the residence of Mr. Veazey, the husband of one of the plaintiffs, where she was removed from the carriage and taken charge of by the plaintiffs.

"I visited the defendant that night at Mr. Veazey's.

"I found her at supper, in her bedroom, the plaintiffs with her.

"Her effort seemed to be to hold up and be pleasant.

"When, at my request, I was left alone with her, she seemed indisposed to talk, and requested me to call and see her, when she should be at her own home.

"Her look and manner convinced me that she was afraid to talk to me there, but that she desired to do so, at her own home, and that she felt that she was a prisoner in the camp of her enemies.

"On Mr. Veazey's assurance that Mrs. Pons would be returned to her home when she so wished and deeming her safe, I thought it but fair for her to be with her daughters, the plaintiffs, for a while, that their experts and attorneys might have free access to her for examination, preparatory to the trial.

"This the expert physicians did, at their will.

"At this home, Mrs. Pons could not be as comfortable as in her own home. While everything was neat and tidy, the house was a single-story cottage, with a side hall and rooms opening into each other, and was well filled by the household. She was deprived of her daily carriage drives in the open air and sunlight. Besides this, she was frequently visited by per-

sons, who came to see her from curiosity, or otherwise, among them, a reporter, who was permitted to interview her, and to publish his account of her infirmities in a newspaper, with sensational comments.

"While she was there, the physicians advised against her carriage drives and against her removal to her own home, and it was suggested that she should be placed in an infirmary, with trained nurses, where the plaintiffs and Mrs. Suarez and any experts and counsels on both sides could have equal access to her. This I refused, and, satisfied that her stay at Mr. Veazey's was injurious to her, I appointed Miss Sara Mayo, M. D., as an expert physician, to examine Mrs. Pons and inform me if she could be removed to her own house with safety and on her favorable report and advice I ordered her removal.

"The deputies, charged with this, had difficulty in getting her away from the plaintiffs. They found her in bed without clothing, and she was not dressed until the officers informed the plaintiffs, that they would remove her at all events. It was April 8, 1913, when she was thus restored to her own home, in a condition of almost total collapse.

"That her stay at Mr. Veazey's operated to her serious injury there can be no doubt.

"I believe that if she had not been returned to her own home, death would have ended her troubles and this litigation.

"It was under circumstances such as these that the expert physicians saw Mrs. Pons, and formed their opinions as to her mental condition, and it is on their opinions, mainly, that the plaintiffs are resting their demand for interdiction. ·

"Can it be said that the examination of the experts, made under such conditions, and their opinions, based thereon, afford safe and sure guides for decision? The Supreme Court, in the Francke Case, 29 La. Ann. 305, has answered my question, in this language, speaking through Chief Justice Manning, as their organ, to wit:

"'We do not propose to accept the conclusions of others as to the decree which a tribunal should pronounce upon a given state of acts, but to take the facts themselves, examine their relation to each other, and their bearing upon the grave matter we have to determine. Nor can we be guided or influenced solely by the opinions of medical men who have made the examination of the proposed interdict at a single interview or under the unfavorable circumstances of a consciousness on the part of the sufferer that she is undergoing a test of her sanity. * * * They all concur in saying that she cannot take care of her personal interests, or manage property. She is a pauvre d'esprit. It is worthy of remark that a leading idea in the minds of the medical experts who * * * examined Mrs. Francke was that a part of their function was to ascertain if she was capable of transacting business, of making or understanding accounts, or of supervising or directing the management of property. Unquestionably the

137 La.—2

proof is conclusive that she can do none of these things.'

"In the same case (29 La. Ann. 314), when the Supreme Court was requested to hear new proofs, and personally examine Mrs. Francke, they said, speaking through Mr. Justice De Blanc, to wit:

"'She has been examined by the district judge, and by distinguished and experienced physicians. We have had their opinions, their reports, their views, their impressions, and we are not inclined to again drag in court, or to again subject to an additional investigation, a nervous, timid, and suffering victim, whose depressed and delicate mind might be confused and affected by what she might construe as a determination to convict her of insanity.'

"And in the same case (29 La. Ann. 307), after stating that the opinions of medical experts are not to be accepted, as conclusive (as I have already quoted), the Chief Justice said:

"'Greater weight is to be given 'to the information given by those who daily surround a person, and whose watchful supervision is constant, than that given by those who approach one at rare intervals and under exceptional circumstances, whose mission, by its very object, predisposes the nervous and craintive patient to increased tension of the * * * mental power left to her.'

"These expressions of the Supreme Court are applicable equally to the examination of defendant by plaintiffs' counsel and the foolish answers that she gave to his questions, at her own home, during the trial.

"Besides the judge, court officers, stenographer, and the seven counsel of record, there were all the plaintiffs and a friend or two, a newspaper reporter, also Dr. Mayo and the nurse. Reclining in a easy chair, plaintiffs' senior counsel, holding her hand, and looking up into her face, at short range, questioned the defendant. Uneasiness, restraint, and embarrassment were depicted in her face, and her manner was nervous and excited. As a method of testing defendant's normal intelligence or sanity, but for the distress that it gave her, it was about as great a farce as could be enacted.

"Let us now turn to the evidence of those persons 'who daily surrounded' Mrs. Pons, and whose 'watchful supervision over her, has been constant', for it is those whose information, the Supreme Court has indicated as the most trustworthy.

"The evidence from these sources is restricted to the period from November 29, 1912, forward to date.

"Plaintiffs' evidence on this line refers to the time from defendant's kidnapping February 18, 1913, to April 8, 1913, when she was returned to her own home, i. e., the time while she was at the Veazey's home; and the defendant's evidence relates to the time when she was at home, say November 29, 1912, to February 18, 1913, and April 8, 1913, to date.

"I give small heed to what is said of her while at Mr. Veazey's.

"Her kidnapping and what she underwent

there rendered her condition such that no fair idea of her usual ordinary normal condition can be gathered from anything that she said or did while there.

"As to her condition at her own home prior to the kidnapping, and after her return home, important evidence is given by a number of persons in different walks of life, who saw and dealt with defendant, by friends who saw her occasionally, and by those who were constantly with her there. One tells of her bargaining with him as to repairs to her carriage; another, as to a horse, which she desired for her service; another, as to her purchase of plants or flowers, and her personal direction as to where she wished them planted; two others as to jobs of repair work that she wished to have done on her premises; another, as to her purchase of wine; another, as to her purchase of jewelry; another, a dressmaker, as to fitting her with a suit that she had ordered; another as to her directions, where she wished to be driven, on her daily outings, and of her stopping to purchase flowers; others, as to her reception of them at her house, and conversations with her, all of whom testified that she seemed normal for one of her age and physical strength.

"Those with defendant at her home were her daughter, who has always lived with her, and a young lady related to her by marriage, her family cook, and coachman, and an old friend, who came often and conversed with her in her native language (Spanish). Since April 8, 1913, a trained nurse has been, and still is, with her, in constant attendance. This lady also testified.

"The concurrent testimony of all of these witnesses is that, while defendant is feeble by reason of old age, she takes interest in what is going on about the household; that she can, with assistance, get about the house; that she has good appetite; that she sleeps well, and no longer starts with fright in her sleep, as she did after her return from Veazey's, and that her condition is normal. Her nurse and Dr. Mayo (the latter on the rule to tax costs in June, 1914) testified to the marked improvement in her general condition.

"One fact that stands out above all else is the defendant's recuperative strength. If we read the testimony of the physicians as to her condition in February, March, and April, 1913, while at Mr. Veazey's, her disordered bowels and kidneys, her liability, from blood pressure, to sudden death, her extreme debility, that made it risky to allow her usual carriage drives, or her visits home for only a day, and then consider her health and strength and condition in the spring of 1914, as proved by reliable witnesses, it cannot be doubted that defendant's powers of recuperation are very great. One thing is sure, she is not the mental and physical wreck now that she seemed to the plaintiffs' witnesses and the experts while at Veazey's in the spring of 1913.

"As the law required of me, I visited Mrs. Pons. I have spoken of my first visit, on the night after she had been kidnapped. My last visit was on the Sabbath before judgment was rendered. I found her with her nurse and daughter, seemingly well and happy. She expressed pleasure at seeing me, and said she was feeling well. Dr. Mayo called, while I was there, and Mrs. Pons greeted her warmly and talked sensibly with her. I did not ask her, how much money she owed, or how much were her rents, nor anything about her properties, or her family history, but I observed her as she sat listening to the conversation between those present, seemingly interested, and I saw nothing unusual or abnormal.

"I noticed, when refreshments were brought in, that she asked her nurse whether she could take some cake and wine, also that she spoke of the cold weather, and if it would kill the flowers (the day being very cold).

"I could add much more, but this opinion is growing long.

"On the whole case, I conclude that Mrs. Pons' trouble, senile dementia, is about what often falls to old age, with its abated strength and its hardened arteries; that she is weakminded; that while feeble, her health is fairly good; that she has shown remarkable powers of recuperation; and that her general condition is infinitely better now than it was during the first six months following the institution of this suit.

"In her own home, in the care of a dutiful and devoted daughter, with ample means to secure all that she may require for her comfort, she is happy and contented and well cared for.

"In the course of nature, many years cannot remain to her; why should she not be permitted to live with them in peace? Why should she be turned over to a curator?

"She is mild and gentle, and happy-hearted; she is not violent or dangerous to others or to herself.

"Under such conditions, the law will not justify her interdiction.

"So much as to her personal condition.

"All questions as to the administration of the defendant's property were withdrawn by the plaintiffs. They offered no evidence and their objection was sustained when defendant offered evidence to repel the plaintiffs' allegations of waste, mismanagement, etc.

"But annexed to plaintiffs' supplemental petition are copies of a mortgage, of two testaments of defendant, a power of attorney, and a tax research.

"There is no proof as to any of these documents.

"While this is so, and while all proof as to defendant's mental condition prior to the institution of their suit was excluded, on plaintiffs' objection to it, there are yet some things that may be worthy of notice.

"As to the two wills, the second revoked the first, but repeated all its dispositions, and added others in favor of the plaintiffs.

"Pierre D. Olivier was the notary, and Wm.

H. Byrnes, Jr., and other gentlemen were the witnesses.

"They were not the men to take the last will of an imbecile dotard, and attest it, as the will of a person of sound mind.

"Their testimony was excluded.

"As to the mortgage $80,000, the Hibernia Bank is the mortgagee. Its president, Mr. Gannon, and its attorneys, McCloskey & Benedict, are not the men to accept such a mortgage from an insane old woman. Their testimony was also excluded.

"As stated, there is no evidence, but the plaintiffs alleged the mortgage and annexed a copy as part of the petition.

"The defendant's sworn answer admitted the mortgage, but declared that the indebtedness began years ago, in the defalcation of an agent, related to one of the plaintiffs, in a large amount.

"As defendant's estate consists of real estate (houses that she rents), insurance, taxes, repairs, delinquent tenants, with interest on the original mortgage, an increase of her indebtedness to $80,000, total, may be easily accounted for, especially when, as is shown, defendant was a free liver, liberal and lavish in her household and with her children; and, for an estate of over $340,000, all things here shown considered, a total indebtedness of $80,000 is not so large.

"As to the tax researches, it may be remarked that if defendant choose to delay payment, in consideration of paying penalties, it was her own affair.

"I have indulged these remarks, as to matters not in the case, because I am convinced that I committed error to defendant's prejudice in excluding the evidence that was offered in her behalf.

"So convinced of this was I that I had serious thought of reopening the case to correct my error, and it was in considering my duty as to this that the line of thought, just expressed, as to matter not in the case, occurred to me, and induced me to render judgment on the case as the plaintiffs had elected to submit it.

"It was on plaintiffs' objection that the case was narrowed down to the mere issue of defendant's personal condition when suit was filed, and since. As they had chosen thus to restrict their case, and as, in my judgment they had failed to show any necessity for the interdiction, it seemed to me that my error in excluding defendant's offered testimony had done her no harm, and I decided the case as it was made up.

"I had not the time during the court session to prepare these reasons for judgment.

"I have written them, as best as I could, from notes that were carefully taken when the record was before me, and the clerk is directed to file them nunc pro tunc."

Article 422, C. C., provides:

"Not only lunatics and idiots are liable to be interdicted, but likewise all persons who, owing to any infirmity, are incapable of taking care of their persons and administering their estates."

Our learned brother found that "the defendant is by reason of physical and mental infirmity unable to care for her person and her property," but, having also found that she had a comfortable home, and was well taken care of by her daughter living with her, and that she had a competent and faithful agent to manage her affairs, he concluded that, under the interpretation put upon said article 422 by this court in the cases of Interdiction of Watson, 31 La. Ann. 759, and Francke v. Francke, 29 La. Ann. 302, there was no ground for interdiction. Those cases are distinguishable from the present by the fact that in the Francke Case the defendant had no property, and was being taken care of by a devoted mother, who sided with her in resisting the interdiction, and that in the Watson Case the only presumptive heirs of the defendant were his mother and sister, who were resisting the interdiction, and showed that for over 10 years they had bestowed upon him the tenderest care and solicitude, and were willing to continue to do so; whereas in the instant case there is bitter division among the presumptive heirs, and grave allegations are made (albeit unsupported thus far by any evidence) against the management of the affairs of the defendant. Hence in their facts those cases are parallel with the present only in what concerns the care of the person of the defendant, and are not authority for withholding the interdiction in the event she is found to be "incapable of administering her estate."

[1] We agree with her learned counsel that the phrase, "incapable of administering her estate," however definite and fixed in its meaning in the abstract, becomes elastic and relative in the concrete, when sought to be applied to some particular state of facts; that we then find that there are kinds and degrees of incapacity, and that some of these do not fall within the meaning of said article 422; that, for instance, a blind man is in a sense incapable of administering his estate,

and so a paralytic and, in fact, many aged persons; and yet that no one would, for an instant, think of interdicting them. But we find no occasion for worrying over what may be in general the meaning of that term; the meaning of the Code is plain enough; it is that the person sought to be interdicted must be found not to be possessed by sufficient mentality to know whether the agents whom he or she is under the necessity of employing are faithful or not.

In the present case this mental deficiency is not doubtful, if the reports of the medical men are to be accepted as conclusive, or if the answers of the defendant to the questions put to her by the experts and by the plaintiffs' counsel are to be taken as entirely reliable tests; but the courts are disinclined to rely entirely upon the reports of medical experts, and we are much impressed by what the learned trial judge has said of this examination of defendant both by the experts and by counsel.

In that connection we are, further, much impressed by the testimony of Dr. Mayo. This lady physician says:

"I did not get correct answers to the questions which I put to her, and I found that she was so confused that she could not tell me the names of her children, or how many children she had, or her own age."

"She had some terror; what this terror was, or the cause of it, I don't know; that cleared off subsequently, but on this day I found nothing to back me up in my diagnosis."

Of the condition of her patient some time after she had been brought back to her own house she says:

"She is quieter. She is easily excited, and, having nothing to excite her, and being under very good condition, she is quieter, not nervous. Her appetite is good. Her digestion is good, and she sleeps better. She is quieter."

This naturally timid and at all times nervous old lady could hardly be expected to make very intelligent answers while under the stroke of this "some terror" of which Dr. Mayo here speaks. We all know that witnesses, otherwise intelligent, will sometimes make such foolish answers when being interrogated in a crowded courthouse as to prove themselves, if judged by these answers alone, fit subjects for interdiction.

We are much impressed, also, by what the learned trial judge says of the recuperative powers of which the old lady has made proof. From his opinion as a whole it is very evident that he was very far from taking the defendant to be the imbecile that her answers to the medical experts and to counsel would make her out to be, and that his first impressions in that regard were greatly shaken by the testimony of "the number of persons in different walks of life" to which he refers. In fact, he says that he would have reopened the case to hear further evidence if he had not found that upon the case as already made up there was no ground for interdiction. This further evidence would have consisted of the testimony of a large number of witnesses, lawyers, notaries, bankers, merchants, tradesmen, mechanics, etc., by whom defendant offered to prove that up to the time of the filing of the proceedings in interdiction against her she had been "perfectly normal and rational in every manner, form, and shape, as well physically and mentally." This testimony should most unquestionably have been heard; plaintiffs' objection to its being heard should have been overruled. Senile dementia, from which the defendant is supposed to be suffering, does not develop suddenly; hence her mental condition at the time the proceedings were filed, and for some time previously, was just as pertinent as her mental condition at the time immediately following the filing of the proceedings; and what better evidence could there be of that mental condition than her conversation, acts, and conduct as observed by the persons she came in contact with in her everyday life.

The judgment appealed from is therefore set aside, and the case is remanded for further trial in accordance with the views here-

in expressed; the costs of this appeal to be paid by defendant and appellee.

O'NIELL, J., dissents, because he is of the opinion that the plaintiffs have failed to prove a necessity for the interdiction, and is of the opinion that the judgment appealed from should be affirmed.

On Rehearing—Statement of the Case.

MONROE, C. J. Defendant is a widow, some 72 or 75 years of age, whose nearest relatives are five married daughters (one of them a widow) and a minor grandson, and whose estate, inventoried for the purposes of this proceeding, was valued by the appraisers at $343.100.79. Her household consisted, for a number of years, of Mr. and Mrs. Suarez (a son-in-law and daughter) and, perhaps, another member of the Suarez family, and her grandson, who, in 1913, was about 18 years old; and, since 1909, her business affairs have been, in the main, under the management of Mr. P. L. Fourchy, one of the counsel who now represent her. On November 29, 1912, the four married daughters, other than Mrs. Suarez, brought this suit for their mother's interdiction, alleging that her condition, mental and physical, was such that she was incapable of caring for her person or property, and that her estate was being maladministered and wasted; and there followed a protracted and bitterly contested litigation (with the four daughters, aided by the grandson on the one side, and the mother and grandmother, aided by the fifth daughter, upon the other), which resulted, in March, 1914, in a judgment rejecting the demands of the plaintiffs, at their cost. From November 29, 1912, when the suit was brought, until February 28, 1913, defendant remained in her own home, with her daughter Mrs. Suarez as her companion. On the date last mentioned she drove out, as usual, in her carriage, and, upon her return to her resi-

dence, was met by her grandson, who, with drawn pistol, prevented her from leaving the carriage, and compelled the driver to take her to the residence of an aunt (one of the plaintiffs herein), where she remained (save for a few hours in March) until April 8th, when, under an order of court, executed by the sheriff, with the aid of the police, she was wrested from the possession of those by whom she was held, carried, by the officers, physically, to a vehicle in front of the house, and thereby returned to her home, where she has since remained under the protection of a guard, and with competent attendants to administer to her wants. Plaintiffs, in opening the case upon its merits, called to the stand three physicians of high standing, two of whom are specialists in diseases of the mind and nerves, and the third, a general practitioner. One of the specialists had been called by defendant's counsel to visit her on December 2, 1912 (a few days after she had been served with process in this suit), and was required to testify, over his objection. He was under the impression that he had paid more than the one visit, but was unable to fix more than the one date, and there was testimony on behalf of defendant that the visit of December 2d was the only one paid. The other two physicians were called to visit defendant for the first time on February 28, 1913, after her abduction, and while she was at the house to which she had been taken, and they continued to visit her until some time in May (after she had been returned to her home), each of them paying some 30 or 40 visits. The three witnesses concurred in the opinion that defendant, as they found her, was suffering from arteriosclerosis, with resulting senile dementia in an advanced degree, and, to some extent, spastic paralysis; that she was altogether incapacitated from taking care of her person or administering her estate; that such had been her condi-

tion for several months or, perhaps a year, the arteriosclerosis, or hardening of the arteries, having, probably, begun several years before; that the disease is progressive and incurable, and must inevitably result in weakening and loss of the reasoning faculty and, sooner or later, in death.

The learned specialists, as we understand their testimony, were of the opinion, though conceding that it is not generally accepted, that senile dementia is not likely to be caused, developed, or precipitated by any mere mental impression, or shock, such as may result from fright or sudden grief, but that, though the disease may develop, or become apparent, after such shock, it does not do so as the result thereof. Thus, in the course of the cross-examination of one of the distinguished gentlemen, passages from a number of works on psychiatry, some of them admitted to be of high authority, were called to his attention, as expressing the idea that "very frequently the disease [senile dementia] develops immediately following an injury, particularly, head injury, emotional shocks, also acute febrile diseases, especially influenza and bronchitis," and the examination discloses the following, among a vast number of questions and answers, to wit:

"Q. The question I asked you was whether the expressions used by this author, which I have read to you, that 'very frequently, this disease develops as a result of emotional shocks,' meets with your approbation, or do they not? A. It does not meet with my approbation. Q. Then, your answer to my question is that you do not agree with him? A. I do not agree with him. I agree with him that it may apparently develop, after emotional shocks, but I do not agree that it does actually develop, as the result of emotional shock."

Still another physician was appointed by the judge to examine defendant and report whether she could safely be returned to her home, and she (being a lady physician), having thereafter attended defendant for the alleviation of her physical ailments, was called to the stand, in December, 1913, and testified:

That she began her attendance on April 8, 1913 (the day defendant was returned home), and had continued it up to the time that she was testifying; that she had found her "a feeble old woman with many senile changes," such as come with arteriosclerosis, and very incoherent in her talk. "She had some terror; what this terror was, or the cause of it, I don't know; that cleared away, subsequently." Being asked, "What is her physical condition to-day; is it improved?" she replied: "She is quieter. She is easily excited, and, having nothing to excite her, and being under very good conditions, she is quieter, not nervous. Her appetite is good. Her digestion is good, and she sleeps better. She is quieter."

It appears, also, that at an early stage of the trial, or before it had actually begun, defendant's counsel had employed, or had had appointed, three other prominent physicians to examine her, in her own behalf, and it was disclosed that they had furnished counsel with a report of the conclusions reached by them, which report counsel spoke of offering in evidence, at the proper time; but it was not thereafter produced, and we think it a fair inference that it was unfavorable to the position of the defense.

After plaintiffs had rested their case, defendant's counsel began with the offer of testimony relating to her condition, physical and mental, prior to the institution of the suit, to which counsel for plaintiffs made the objection that it was immaterial, and thereupon the court made the following ruling, to wit:

"The Court: My opinion is that the only issue here is whether or not Mrs. Pons was, at the time of the institution of this suit, and is at the present time, incapable, by reason of her mental infirmity, of taking care of her person or of administering her estate.

"Mr. Fourchy (defendant's counsel): Your honor will allow us, I suppose, to ask the question, What was her condition on the day before the proceedings were filed?

"The Court: Yes; for the purpose of formulating your bill, but the witness will not answer."

And the ruling so made was adhered to throughout the trial. Subsequently a certain portion of the testimony which had been given by one of the plaintiffs, and which was thought to have transgressed the rule, was,

by consent of plaintiffs' counsel, ordered to be stricken out. But the testimony of plaintiffs' main witnesses, the medical experts (to the effect that the condition in which defendant was found by them was likely to have existed before the institution of the suit), escaped observation and was allowed to remain in the record. Defendant then called to the stand a great many witnesses (perhaps 50, or more), a number of whom testified to intercourse, or conversations, with defendant, after the institution of the suit, in which she appeared to them to be sane and normal, but none of whom were permitted to give any testimony as to her condition prior to the institution of the suit. It, then, appearing that many more witnesses had been summoned, it was suggested that counsel make a statement of what they expected to prove by them, in order that a single ruling might be made and defendant's rights with respect thereto reserved in a single bill of exception; and thereupon counsel presented a list of 30 names, many of them borne by well-known lawyers, notaries, and business men, with the statement:

"By these witnesses, and each of them, we propose to prove that they have known Mrs. Pons for a great many years, some as far back as 20 years; that they were thrown a great deal in contact with her, socially and in business; that at all times, always, prior to the institution of these interdiction suits, they found Mrs. Pons perfectly normal and rational, in every manner, form, and shape, physically as well as mentally; that she was able to transact her own business, collect her own rent, in some cases making her own bargains, signing her own acts of sale and contracts, and having a general supervision of the property up to the time of the interdiction proceedings on November 29, 1912."

And the proposed testimony having been objected to, and the court having excluded it, a bill was reserved.

Thereafter defendant's counsel tendered her daughter Mrs. Suarez and her attorney Mr. Fourchy as witnesses to prove (the one or the other or both) that for years prior and up to the day of the institution of this suit for interdiction, defendant had attended to her person and her business; that she had walked about her house and garden, driven about the city, every day, rain or shine, inspected her houses, at times collected her rents, made contracts for repairs, discussed prices, and made payments; that she was out driving on the day that this suit was instituted; that when she received the papers, they were read to her (she being illiterate) by her daughter Mrs. Suarez, and that she was thereby thrown into a state of nervous collapse, which lasted for several days; that when, in February following, she was kidnapped, by her grandson, and taken forcibly to the house of her son-in-law, the husband of one of the plaintiffs, and there detained, the effect, when, in March, she was allowed to return to her home temporarily, was that she reached there in such a condition that she could neither talk, walk, stand, nor recognize any one, and that when she was finally returned to her home, in April, she was in a most enfeebled condition—unable to swallow even a spoonful of water or to hold a spoon in her hand—and was brought back to life and to a better condition only by the devoted attention of her physician. The offer so made was ruled out, and a bill of exception was reserved.

In his reasons for judgment, the trial judge states that plaintiffs abandoned their charges of conspiracy, maladministration, and waste, and the statement is sustained by the record. Counsel for plaintiffs say that evidence in support of those charges would have been irrelevant and inadmissible, and in one view of the case they are right, though, considering the ground upon which the judgment appealed from is based, it would appear to us to have been highly important. As we understand it, however, the trial judge was of a different opinion, while the trial was in progress, and did not then regard such evidence as rele-

vant. The learned judge, proceeding with his reasons, says:

"It follows that, by this action of the plaintiffs, there is no issue of fact left in the case, except as to the mental and physical condition of defendant, at the date when this suit was brought, and since. Thus narrowed by the plaintiffs, the question presented is whether Mrs. Pons, the defendant, is, by reason of her physical and mental infirmity, unable to care for her person and her property; and this fact conceded, for, unquestionably, it is true, the only remaining issue of fact is *whether there is an actual and unavoidable necessity for her interdiction.*"

Towards the close of the opinion, our learned brother, after a passing reference to some matters which he did not consider germane to the issue under consideration, mentions his ruling upon the admission of evidence as follows:

"I have indulged these remarks as to matters not in the case because I am convinced that I committed error, to defendant's prejudice, in excluding the evidence that was offered in her behalf. So convinced of this was I that I had serious thought of reopening the case to correct my error, and it was in considering my duty as to this that the line of thought just expressed, as to matters not in the case, occurred to me, and induced me to render judgment on the case as plaintiffs had elected to submit it. It was on plaintiffs' objection that the case was narrowed down to the mere issue of defendant's personal condition when suit was filed, and since. As they had chosen thus to restrict their case, and as, in my judgment, they had failed to show any necessity for the interdiction, it seemed to me that my error, in excluding defendant's testimony, had done her no harm, and I decided the case as it was made up."

### Opinion.

[2] The evidence in the record is conclusive, we think, to the effect that, whatever may have been defendant's condition at the moment of the institution of the suit, she was (or became) at a later period, and prior to the rendition of the judgment, afflicted with senile dementia in such degree as to render her incapable of taking care of her own person and administering her estate; and the learned judge a quo, conceding that to be "unquestionably * * * true," and

in view of the exclusion of defendant's testimony, rested his judgment, denying her interdiction, solely upon the ground that no "actual and unavoidable necessity" therefor was shown. The necessity arises, however, from the obligation, imposed upon the courts, to obey the mandates of the law which declares that:

"No person above the age of majority, who is subject to an habitual state of imbecility, insanity or madness, *shall be allowed* to take care of his own person and administer his estate, although such person shall, at times, appear to have the possession of his reason." C. C. 389. * * *

"Every relation has a right to petition for the interdiction of a relation. * * *" C. C. 390.

"If the person who should be interdicted has no relations and is not married, or if his relations or consort do not act, the interdiction may be solicited by any stranger, or pronounced ex officio, by the judge, after having heard the counsel of the person whose interdiction is prayed for, whom it shall be the duty of the judge to name, if one be not already named by the party." C. C. 391.

"Not only lunatics and idiots are liable to be interdicted, but likewise, all persons who, owing to any infirmity, are incapable of taking care of their persons and administering their estates. *Such persons shall be placed under the care of a curator, who shall be appointed and shall administer* in conformity to the rules contained in the present chapter." C. C. 422. (Italics by the court.)

[5] The words "of imbecility, insanity or madness," in article 389, are translations of "d'imbécilité, de demence ou de fureur," found in French text of the Codes of 1808 and 1825, and are the identical words of article 489 of the Code Napoleon, which are held by the French commentators to be declaratory of what is, in reality, the one ground of interdiction, to wit, mental alienation, consisting of absence of, or change in, the faculty of reasoning and discerning, and which renders the person incapable of taking care of himself and administering his affairs ("l'aliénation mentale, qui consiste dans l'absence ou l'altération de la raison et du discernment, et qui rend l'homme incapable de se gouverner lui-même et de gouverner ses affairs," Dalloz, Code Ann. vol. 1, pp. 791, 792); and, as furnishing

a complete table and precise nomenclature intended to include all forms of mental alienation (La pensée de notre législateur est très certainement que l'aliénation mentale sous toutes ses formes peùt être une cause d'interdiction. Il a cru donner un tableau complet et une nomenclature exacte des divers cas d'aliénation mentale en employant les expressions imbécilité, demence, fureur; et il importe peu que les aliénistes moderne aient adopté une classification différente, non seulement quant au nombre des cas d'aliénation mentale, mais aussi quant a leur dénomination; cela ne peut évidement rien changer au Code Civil." Baudry-Lacantinerie, Précis de Droit Civil [9th Ed.] vol. 1, p. 635).

As stated in the opinion heretofore handed down, the case of Francke, cited by defendant's counsel, is to be distinguished from this case in that the defendant, Mrs. Francke, had no property, and was being cared for by a devoted mother, who resisted the interdiction. But beyond that it will be seen that, in the opinion refusing the rehearing, Mr. Justice De Blanc, as the organ of the court said:

"It was not, however, on that charge of adultery, or on that tacit admission of its truth, that we have based our decision; but on the fact that on the trial of this case it was not proven that Mrs. Francke was insane or that she is an imbecile, and it was proven that her condition had remarkably improved, and that she can, at present, take care of her person; that she is not a burden to her husband, or a danger to her children; that she has, in no way, exposed their rights or troubled their welfare; and that her interdiction cannot be claimed or allowed either as a matter of right or of necessity, either in her own or the interests of others." Francke v. His Wife, 29 La. Ann. 314.

In the Watson Case, the presumptive heirs of the defendant resisted the interdiction, and the majority of the court was, no doubt, influenced by that consideration; but, as may be gathered from the syllabus, the judgment was placed upon the ground that the evidence failed to make out a case of insanity, calling for interdiction, and that aspect of the matter was reviewed by Mr. Justice White, with whom Mr. Justice Spencer concurred, in a dissenting opinion, in which, asking the question, "What is the law," and, answering it by quoting article 389 of the Civil Code, the learned writer of the opinion propounds the further question:

"If the defendant be insane, how can the mandatory provisions of the law be avoided without substituting the volition of the judge for the will of the lawmaker?"

[3, 4] And so we say here: If the defendant now before the court be insane, and was insane during the trial in the district court, how can the court escape the discharge of the duty, imposed by the lawmaker in mandatory terms, of so declaring, in order that she may obtain the benefit, with respect to her person and property, of the protection which the law contemplates, and will then secure her. As matters stand at present, she herself is under the protection of sheriffs, or police officers, acting under the authority of the court, and her property is being cared for by an administrator pro tempore; but the law confers upon the courts no authority to perpetuate indefinitely such an arrangement; and the question suggests itself, What is to happen should they take off their hands and leave their ward and her estate with no one legally authorized to care for the one or to administer the other? We know of no satisfactory answer to that question, and we conclude that the decree of interdiction must be pronounced, but not by this court, at this moment, or by the district court. We are satisfied, as we have stated, that the defendant is, now, a proper subject for interdiction, but we are not satisfied that she was so at the time that this suit was instituted, since the testimony of a large number of witnesses was tendered, as capable of showing that, up to the moment of the institution of this suit, she was not in her present condition, but was able, to take care of her person

and manage her affairs, and that testimony was excluded, thereby, as we think, leaving at large the question of the time at which she became incapacitated, and, perhaps, of the immediate cause thereof. Senile dementia is shown to follow, as a consequence, the hardening of the arteries, but it does not begin with the beginning of such hardening, and we are not informed as to the exact stage in that process when it does begin. It is shown that ordinarily both diseases progress slowly; but at times more rapidly, and that the dementia may exist and yet be nonapparent even to those who are nearest to the sufferer, but it is not shown at what particular stage in the progress of the diseases the mind of the sufferer becomes so far alienated that he or she can be called insane; and out of that condition arises the question, If the dementia of the defendant, at the date of the institution of this suit, and prior thereto, was apparent to no one, how is it to be shown to have existed? If the answer be that it will be shown by the deductions of the specialists, we reply that the deductions of those who did not see or examine the defendant during the period in question will have to be weighed, in such case, with the testimony of those who did see, associate, and transact business with her; and in that connection the court may be called on to consider whether an undeveloped or nonapparent dementia is within the meaning of the statute, and whether such dementia, theretofore undeveloped or nonapparent, may be developed or made apparent by a shock to the mind or nerves, when otherwise and without such shock it would remain, for whatever period, undeveloped and nonapparent. The questions thus suggested are of importance in this case because of the heavy expense which has been incurred, and for which it may be (though we do not decide that question) that plaintiffs, and not the estate of the defendant, should be held liable, in the event it should be found that defendant became demented, within the meaning of the statute, only after and as the result of the interdiction suit or the proceedings connected therewith. And as defendant and her estate appear to be well cared for under the present temporary arrangement, we see no good reason why they (the questions) should not be disposed of in such time and manner as to enable the trial judge then to determine whether the interdiction of the defendant should be pronounced in this suit, at the instance of the plaintiffs, or by himself, acting ex officio, under the obligation imposed by C. C. 391, or in some other proceeding.

It is therefore ordered that the decree heretofore handed down be amended in so far as to direct that the further proceedings in the district court be conducted in accordance with the views expressed in the foregoing opinion, and, as thus amended, that said decree be reinstated as the final judgment herein.

O'NIELL, J., being of the opinion that the plaintiffs' suit was properly dismissed, because of their refusal to show any necessity for the interdiction, respectfully dissents from this decree.