EDWARDS, Judge.
Anthony Reno filed this suit to interdict his mentally retarded sister, Mary Josie Reno Fabre. An attorney was appointed to represent Mrs. Fabre when she did not file an answer. From a judgment pronouncing the interdiction, defendant has appealed. Reno has answered the appeal contesting the attorney’s fees and expert’s fees awarded by the trial court and contending that the appeal is frivolous.
Two causes for interdiction are stated in the Civil Code, to wit:
Art. 389. “No person above the age of majority, who is subject to an habitual state of imbecility, insanity, or madness, shall be allowed to take care of his own person and administer his estate, although such person shall, at times, appear to have the possession of his reason.” Art. 422. “Not only lunatics and idiots are liable to be interdicted, but likewise all persons who, owing to any infirmity, are incapable of taking care of their persons and administering their estates.
“Such persons shall be placed under the care of a curator, who shall be appointed and shall administer in conformity with the rules contained in the present chapter.”
In interpreting these articles, the jurisprudence recognizes that there are three prerequisites to the pronouncement of a judgment of interdiction: 1) incapacity to administer one’s estate; 2) inability to care for one’s person; and 3) an actual necessity for the interdiction. In Re Adams, 209 So.2d 363 (La.App. 4th Cir. 1968) and cases therein cited.
The question for review is whether the evidence is sufficient to support the judgment of interdiction.
Mrs. Fabre was born on February 11, 1946, and was 31 years old at the time of the trial. She was married twice, with the first marriage ending in divorce. She married her second husband, Antoine (Anthony) Olix Fabre, on July 20, 1971. One child, Charles Anthony Fabre, was born during her marriage with Mr. Fabre. In addition, Mrs. Fabre had previously borne, prior to her marriages, two illegitimate children, whose fathers’ identities are unknown. One of the illegitimate children was put up for adoption and the other was being raised by Mrs. Fabre’s mother. On August 11, 1977, Mrs. Fabre’s husband died, leaving an estate (combined with that of Mrs. Fabre) valued in excess of $47,000. The instant suit was filed on September 6, 1977.
The court appointed a psychiatrist, Dr. Francisco A. Silva, to examine Mrs. Fabre to determine whether or not she was able to care for her person and to administer her estate. Additionally, two clinical psychologists examined Mrs. Fabre: Don Lichtenstein (at Dr. Silva’s request) and Linda M. Floyd, Ph.D. (at the behest of defendant’s attorney). The evidence at trial consisted of the testimony of these three experts as well as the testimony of seven other witnesses.
Dr. Silva examined Mrs. Fabre on August 22, 1977. He stated in his testimony and in his written report that Mrs. Fabre was unable to make important decisions in her life and was unable to handle money. He found that she did not know her age, her childrens’ ages, the date, the year, her phone number or her address. He also found that she could not read, write, add, *1318 subtract or make change. He testified that she was capable of menial tasks such as keeping house, going around the neighborhood unattended and having social contact with people. However, he stated that she was “unable to abstract in a reasonable and constructive fashion when left to her own devices.”
Dr. Silva referred Mrs. Fabre to Don Lichtenstein for the administration of various IQ tests. The tests were conducted on August 24, 1977, and included the Wechsler Adult Intelligence Scale, Peabody Picture Vocabulary Test, Wide Range Achievement Test and Vineland Social Maturity Scale. Additionally, Mr. Lichtenstein interviewed Mrs. Fabre on November 7, 1977.
Mr. Lichtenstein testified and stated in his report that Mrs. Fabre’s scores on the various tests indicated work at a beginning first grade level or lower. He stated that her scores on the Wechsler test fell within the Moderate[1] Mental Retarded Range of Intelligence 'as characterized by the DSM II. He found that she could not read, write, do arithmetic problems, make change, abstract or reason constructively when left to her own devices. He noted that she was unable to tell time, say the alphabet (even when prompted), recognize numbers beyond 10 (though she can count verbally to 15), or hold up eight fingers. He also noted that she could not describe the shape of a ball, tell how many months in a year or find a similarity between two objects (e. g., apple-orange). He stated that she would be unable to handle any financial affairs or even routine buying of things, because she could not make change or distinguish between different denominations of money above a one dollar bill.
Linda M. Floyd examined Mrs. Fabre on November 16, 1977, at Mrs. Fabre’s home. Ms. Floyd stated in her report that “there is no doubt that Mary is incapable of managing her money . . .” However, she indicated (and cited several examples to substantiate her belief) that Mrs. Fabre manages well in her home and that Mrs. Fabre demonstrates, in her opinion, some capacity to discriminate in certain situations.
In addition, Anthony Reno (the plaintiff), his wife Joyce Ann Reno, Joseph Reno, Jr. (another of Mrs. Fabre’s brothers), and Myrtle R. Chaney (a neighbor of Mrs. Fa-bre) all testified that Mrs. Fabre keeps an immaculate house, cooks, cares for her son, mows the lawn, and maintains a neat appearance. They also testified that she is always friendly and social. However, each testified regarding Mrs. Fabre’s severe inability to handle or manage money.
Mrs. Fabre did not testify at trial.
The trial judge after reviewing all the evidence concluded in his Written Reasons for Judgment:
“Judged by the codal and judicial requirements for interdiction, the Court determines that Mrs. Fabre is unable to administer her estate and her financial affairs therefore requiring the assistance of a curator. While she can care for her person in a minimal, familiar domestic environment, she cannot function in an uncontrolled, unfamiliar situation. Accordingly, the Court believes that the crucial criteria has been met and Mrs. Fabre should be interdicted.”
There can be little doubt that Mrs. Fabre is incapable of administering her estate. The three psychological experts who examined Mrs. Fabre, including her own clinical psychologist, each testified that she was unable to manage money. This conclusion is supported by the facts that Mrs. Fabre can not make change or distinguish between different denominations of money, and that she understands nothing of the value, administration or management of money. The remaining evidence preponderates conclusively in favor of this conclusion.
Regarding the second prerequisite for interdiction, the plaintiff established that Mrs. Fabre was unable to care for her person.
*1319 The evidence on this issue revealed that Mrs. Fabre had learned and was capable of performing routine household chores. She was able to cook, clean, make up beds, mow the lawn, dress and undress herself and her son, and maintain personal hygiene. All these functions were learned through imitation and repetition. However, the record also established that Mrs. Fabre’s fund of general knowledge is very limited and that her mental understanding is roughly equivalent to that of a six or seven year old. Dr. Silva and Mr. Lichtenstein each testified that Mrs. Fabre has practically no ability to abstract or reason constructively when left to her own devices.
The ability to care for one’s person has been interpreted as meaning more than the mere performance of menial tasks such as dressing, washing and household chores which inmates of insane asylums daily perform. In Re Corbin, 187 La. 968, 175 So. 636 (1937); Landry v. Landry, 171 La. 280, 130 So. 866 (1930). The court In Re Adams, supra, stated at page 367:
“ * * * The prerequisite of inability to care for one’s person encompasses more than the capacity to perform some household duties, properly robe and disrobe one’s self, and conduct one’s self at the meal table (see Landry v. Landry, 171 La. 280, 130 So. 866). A normal seven year old child is capable of doing those things. * * * »
In the final analysis, however, each interdiction must depend on its own particular facts since mental infirmities and deficiencies vary greatly in nature and degree. Accordingly it is not possible (nor will we attempt) to set down a hard and fast rule for determining whether or not one is capable of caring for one’s person.
In the instant case, we are unable to say that Mrs. Fabre, who possesses the mentality of a six or seven year old, is capable of earing for her person. On the contrary, we find that' the evidence is sufficiently clear that without assistance she can not provide for her needs or cope with the varying factors which daily affect her life. Life in its essence involves innumerable forces which invoke changes, modifications and subtle nuances in our behavior. Mrs. Fabre is not able to deal with such changes as a result of her mental deficiency and her inability to abstract and reason constructively on her own. We therefore believe that the second prerequisite has also been satisfied.
The necessity requirement is not contained in the codal provisions concerning interdiction. Rather it apparently arises from dicta in the cases of Francke v. His Wife, 29 La.Ann. 302 (1877) and Interdiction of Watson, 31 La.Ann. 757 (1879) and has been carried forward in other cases, most recently in In Re Adams, supra and Doll v. Doll, 156 So.2d 275 (La.App. 4th Cir. 1963).[2] The Supreme Court in Pons v. Pons, 137 La. 25, 68 So. 201 (1914) expressly held that interdiction must be ordered where the dual test of inability to care for person and property is satisfied. The Court de facto overruled the Francke-Watson necessity requirement when it stated at page 209: “The necessity arises, however, from the obligation imposed upon the courts to obey the mandates of the law . . .”
Although the necessity requirement has been repeated often in cases subsequent to Pons, no case has denied interdiction because of lack of proof of necessity where the two codal requirements were satisfied.
We find that Pons did away with the necessity requirement in interdiction proceedings and that no proof was required on this issue.
We conclude that Mrs. Fabre is incapable of caring for her estate and person, and that the judgment of interdiction is justified.
Appointed counsel for Mrs. Fabre alleges as a second specification of error that the award for attorney’s fees, which was taxed against Mrs. Fabre’s estate, is inadequate *1320 and should be increased to include work performed on appeal.
We find that this issue is not properly before the Court inasmuch as it is an obvious conflict with Mrs. Fabre’s interests and should have been raised by the attorney on her own separate appeal. See LSA-C. C.P. art. 2086. We will not discuss further this contention.
Plaintiff answered the appeal. He contends that the attorney’s fees are excessive and that the expenses allowed the attorney were not properly recoverable.
The trial court awarded a total attorney’s fee of $1,920, which was $1,500 for counsel’s services and $420 for out-of-pocket expenses in connection with the litigation.
A trial judge is granted much discretion in the assessment of attorney’s fees and his determination will not be disturbed absent a showing of an abuse of this discretion. We do not find that an award of $1,920 for attorney’s fees in a case where counsel has expended more than 76 hours in defense of his client amounts to an abuse of discretion.
Plaintiff also argues that it was error to reimburse appointed counsel for her expenses, as such expenses are not recoverable under LSA-C.C.P. art. 4551.
We find that LSA-C.C.P. art. 4551 is not apposite. We believe that a consideration by the trial court of the amount of out-of-pocket expenses incurred by an appointed attorney is proper in determining the amount of a reasonable fee. We do not view the inclusion of these expenses in the total attorney’s fee as error.
Second, plaintiff contends that the trial court erred in awarding any expert witness fee for Drs. Walsh, Muffoletto, and Floyd, alleging that their testimony was irrelevant and immaterial.
We do not accept this contention. Each of the three witnesses qualified and was accepted without objection as an expert witness. Each gave opinion evidence which upon a proper evaluation would aid the trial court in determining whether a judgment of interdiction was justified. The trial court awarded each witness a fee of $75. We believe that the fees were warranted and that they were properly awarded by the trial court in the exercise of its discretion regarding expert testimony.
Finally, plaintiff contends that this appeal is frivolous and that the court should refuse to tax costs.
We do not agree. This appeal involves profound issues affecting a person’s civil freedom. Aside from plaintiff’s allegation, there is not the slightest indication that this appeal was perfected solely for the purposes of delay or that defendant does not seriously believe in her asserted contentions. Neither is there even a hint that this appeal is frivolous.
For the above reasons, the judgment appealed is affirmed. Costs are taxed against the interdict’s estate.
AFFIRMED.

. There are four classifications of mental retardation which are, in increasing order of severity: mild, moderate, severe and profound.

. For an excellent discussion of the origin and validity of the necessity requirement see The Work of the Louisiana Appellate Courts for the 1967-1968 Term-Interdiction, 29 La.L.Rev. 180 (1969).