## No. 12,763.

### MRS. FLORENCIA CALDERON VS. AUGUSTINE MARTIN,

#### HER HUSBAND.

Mental infirmities are infinite in degree. The law intervenes in behalf of a person when the malady affecting his intelligence prevents him from governing his person and his property.

These are the tests, and one may be interdicted although he is not always devoid of all power to reason.

The condition in this case makes manifest habitual mental alienation, and the consequent necessity of appointing a curator to safeguard defendant's person and property.

To protect every right of the interdict and soothe his condition as much as possible is the object of the law in authorizing interdiction.

APPEAL from the Civil District Court for the Parish of Orleans. *Monroe, J.*

---

*H. N. Gautier* and *L. P. Paquet* for Plaintiff, Appellee.

---

*A. A. Ker, H. E. Upton, Lazarus, Moore & Luce* for Defendant, Appellant.

73

Argued and submitted April 22, 1898.
Opinion handed down May 2, 1898.
Rehearing refused June 28, 1898.

The opinion of the court was delivered by

BREAUX, J.    The wife brought this suit for the interdiction[¹] of her husband, on the ground of mental unsoundness, rendering him incapable of properly administering his estate and of taking care of his person.    The father of the defendant died testate in 1893, leaving his property, valuable at his death, to his widow and his only offspring, the defendant.    To the former he bequeathed one-third of his succession, with the usufruct of the remainder, and to the latter two-thirds, subject to the mother's usufruct.

In 1894 plaintiff was married to the defendant.    The evidence discloses that his mental faculties were always weak.    Of late years he has become quite timid, to a degree that he is unwilling to leave his home alone.    When he is away from his home he is afraid to return without having some one with him.    At his home he shows by his acts and utterances that he is weak and almost entirely devoid of all will power.    He is unable to correctly calculate or to multiply simple numbers.    His utterances are difficult and not easily understood. These are the salient facts stated by the witnesses for plaintiff. About an equal number of witnesses for defendant expressed a different view in regard to his mental condition.    We infer that all the witnesses agreed in the opinion that the defendant is frequently abnormally nervous, and that he is unable to earn a livelihood, but those for the defendant evidently did not think that his condition was such as to warrant his interdiction.    With reference to the property left by the father, which was all he had, it was wasted, save a small amount.    His mother had not chosen to adhere closely to the limitation manifestly desired by the father and testator in regard to the disposition of the property bequeathed.    The mother and the son together have freely expended amounts inherited, so that at this time a large estate is of little value.    The District Judge heard the witnesses.    He heard the defendant testify and propounded a number of questions to him. Judgment was rendered holding that the defendant was incapable of performing validly any of the acts which a person of sound mind

could perform and decreeing his interdiction. The questions before us for our determination are brought upon appeal of the defendant from the judgment of interdiction. In our opinion, defendant's sad condition comes within the grasp of the law which authorizes the interdiction of one who, because of mental incapacity, is unable to properly protect himself and manage his estate. The defendant can not, in his present state of mental weakness, transact the customary business of life. He is not, in the strict sense of the word, absolutely insane, but he is none the less, in our view, as much in need of protection as if his case were one strictly of the most pronounced type of insanity.

The expenditure of his patrimony and his total failure, in a satisfactory manner, to account as a witness for the loss, is a direct manifestation of most lamentable mental weakness. By his incoherence in answer to questions he made it evident that he did not really know what had become of his property.

The testimony taken as a whole indicates, in our opinion, a derangement of the mind's functions. We do not assert for an instant that the defendant is a confirmed lunatic. Alienists have asserted, and we think correctly, that those designated as imbeciles in law may ordinarily make use of their senses; may have ideas, memory and some judgment, and conduct themselves more or less properly at times; they may read, articulate words with more or less clearness, even calculate when the calculation is not complicated. Defendant's case falls within the definition. In our judgment, within proper limits a definition of habitual mental infirmity might be given less wide and comprehensive than the foregoing definition that would cover defendant's case.

With reference to the defendant, we will not use the harsh word "imbecile," as there is no actual necessity to use the word. He has no knowledge of numbers, and he is, we think, as incapable of comprehending his interests properly as any person who may come within the definition by alienists of *non compos*.

We must affirm, the evidence shows, that he is mentally infirm and a proper subject to place in charge of a guardian.

Personally, the defendant's condition awakens sympathy. Evidently he is kind and loving to his mother. In his mental blindness he never fails to discern his mother and to call on her in his distress. It appears that he sometimes on the streets near his home is exposed to the scoffs and jeers of mischievous and thoughtless lads.

In these and other troubles of the kind, he, boylike, would endeavor to get his mother's protection; an appeal to which the good mother never fails to respond, however disagreeable the afflicted offspring may be to others.

We do not suppose that any one is to be benefited, or that any one seeks an advantage in having defendant interdicted. The law has established measures of protection for the interdict only. The purpose is the care of his person and the proper gestion of his property. The solicitude of the law is made manifest by the different articles of the Code. These articles look to kindly and proper offices on the part of the law's agents. With studious care it has provided that the income of the person interdicted " shall be employed in mitigating" his sufferings and in accelerating his cure. C. C. 418. It is also made the duty of the judge to visit the person interdicted, and otherwise to inform himself of the state of his health. C. C. 424, 425.

The defendant cited the case of Francke vs. His Wife, 29 An. 302-315. There are, in our view, impressive inferences to be drawn from that decision which are favorable to plaintiff's demand. Mrs. Francke, the person it was sought to have decreed insane, in the cited case, had no property. Here, on the contrary, we are informed that there is a little property, which, under the management of a curator, may be applied to soften the hard lot of the interdict, who manifests no disposition or capacity for labor or employment of any sort.

Different, also, from the cited case, there is here option left to the court in selecting a curator upon whom the duty will devolve of asserting all of defendant's rights, and there is, therefore, no ground for the application of the intimation found in the cited case. The conjugal rights between the defendant and the plaintiff remain, and all rights, without the least reservation, are sacred. It is the curator's duty to uphold them all before the courts, be their nature what they may. The wife is not necessarily the curator of the husband. But the husband, under the law, is the curator of the wife; in consequence, the intimation in the Francke case does not apply. The interdicted person is entitled to every regard and sympathy. The greatest care should be taken to maintain all his claims.

It is therefore ordered, adjudged and decreed that the judgment appealed from is affirmed, at appellant's costs.

Rehearing refused June 28, 1898.