Section 982 of the Revised Statutes provides that:

"Whenever the punishment of fine and imprisonment are left by law at the discretion of any court, the fine shall not exceed one thousand dollars, nor the imprisonment two years."

The city court of Shreveport having jurisdiction to try all misdemeanors, the offense charged being a misdemeanor under the law, and the sentence imposed being less than 2 years' imprisonment without hard labor, it follows that there is no merit in the contention made by counsel for defendant in the city court.

The judgment is affirmed.

HIGGINS, J., takes no part.

177 So. 573

Interdiction of SCURTO.

No. 34504.

Nov. 2, 1937.

Rehearing Denied Nov. 29, 1937.

Harris Gagne, of Houma, for appellant.

Ellender & Ellender, of Houma, for appellee.

FOURNET, Justice.

This is an appeal by the defendant from the judgment of the lower court pronouncing her interdiction.

The Revised Civil Code, under article 389, provides: That "no person above the age of majority, who is subject to an habitual state of imbecility, insanity or madness, shall be allowed to take care of his own person and administer his estate." And under article 422, the Code further provides that: "Not only lunatics and idiots are liable to be interdicted, but likewise all persons who, owing to any infirmity, are incapable of taking care of their persons and administering their estates."

"Mental infirmities are of infinite degree, and to what extent the mind must be affected to warrant a judgment of interdiction is largely dependent upon the particular facts of each case. The accepted rule is that the law intervenes in behalf of a person when the malady affecting his intelligence prevents him from governing his person or his affairs." Interdiction of Grevenig, 164 La. 1026, 1032, 115 So. 133, 135. See, also, Francke v. His Wife, 29 La.Ann. 302, 312.

The case was first fixed for trial on October 26, 1936, when the testimony of the father, his two sons, Dr. Collins, and the defendant testified. A review of the testimony offered by the plaintiff gives very little information on the condition and behavior of the defendant for one to base a judgment as to her mental condition. The testimony of Dr. Collins, the physician who, as claimed by the father and his two sons, advised them to have the defendant exam-

ined by a specialist, impresses us with the view that he did not think there was anything wrong with the girl, and apparently the suggestion that she be examined by an alienist came from the family, for we find the gist of his testimony well summed up in the following portion thereof:

"Q. I am not trying to get out of you an opinion as to her mental capacity, because as you stated, you are not an expert, but what I want to know from you any effort the family made in order to have her examined, treated for her condition? A. As already mentioned before they asked me about her mental condition. I told them to go to a mental expert, I was not in contact enough and did not have knowledge enough of the case. I didn't examine the girl except in one instance, in the house she was a little morose at the time, but I didn't know of any act she committed."

"Q. What do you mean when you say she was morose? A. Well she stayed home, she wouldn't go around, didn't want to mingle with other people very much, but that does not necessarily mean there was any mental defect."

The defendant took the stand in her own behalf and her answers to the questions propounded both on direct and cross-examination do not reveal any mental infirmity. On the contrary, her testimony compares favorably as to intelligence with that of the other members of her family who testified in the case.

At the adjournment hour of the court, counsel for the plaintiff evidently realized they had not successfully borne the burden of proof in the case, and thereupon reurged

a motion, previously filed by them and which had been recalled by order of the court, for the appointment of medical experts. Two days later, "the court informed counsel for both sides that it would call in Dr. J. B. Duval, Coroner, of the Parish of Terrebonne, and Dr. Charles Barker, Coroner of the Parish of Lafourche, to examine Miss Josephine Scurto, touching upon her mental condition or other infirmities having relation to or affecting her capacity to administer her own estate, and care of her person." (Minutes of the court, October 28, 1936.) The two physicians appointed by the court made their written report, duly sworn to before the deputy clerk of court on December 13, 1936, showing that "Miss Josephine Scurto appears to be sane and capable of taking care of person and administering her personal estate."

The trial of the case was resumed on the 9th day of January, 1937, and the two physicians appointed by the court were called as witnesses by the plaintiff and examined at length with reference to their findings after their examination of the defendant and the reasons for their conclusions. Their testimony reveals that they examined the defendant personally by interviewing and interrogating her for several hours and on several occasions. The opinion of Dr. C. J. Barker may be fairly summed up in the following portion of his testimony:

"Q. Would you tell the court what was the nature of your examination? A. My understanding was that we were to examine her mentally, as to whether she was sane or insane, and then if she had property, if she was able to take care of it her-

self, or whether she was able to take care of herself or her property.

"Q. How did you determine that, by questioning or by certain tests? A. No laboratory tests were made. We met her in her home, that is where she was stopping, and by a series of questions and her answers, I determined that she was sane, to the best of my ability, and that is my opinion. Then about her property and herself, we came down here to the Courthouse and found out from the records what she did own from the Clerk of Court and what disposition had been made of it, and we found out from her that she, of her own free will had decided it was to her best interest to dispose of her property to her sister. We tried to find out why she had done that and she said it was because she felt she was secure with her sister and for the rest of her life she would live with her, and we asked her if she had thought of selling to any one else, and she said that she had no excuse for what she had done, and that fear kept her away from her folks.

"Q. From your examination of her would you say that she is mentally normal in every respect? A. What do you mean by that, do you mean sane?

"Q. Does she suffer from any mental inferiority that you could see? A. We went back further than that in her early life when she went to school. She finished high school here with grades of the average student, so up to that time she was apparently an average person.

"Q. Couldn't a mental inferiority have developed after that? A. Yes, that would be possible, but she showed no signs of any

insanity. She gave a reasonable answer to any question that we put to her. I can add this, when asked why she did sell her property to her sister, she answered that it was because of fear that her brothers wouldn't do just right by her, her family aside from her sister.

"Q. What reason did she assign for selling her property to her sister? A. That she felt that her sister would do more for her than any one else."

The testimony of Dr. Duval corroborates that of Dr. Barker. He was of the opinion that she answered all questions intelligently, and was sane and capable of handling her affairs.

The only other evidence offered on that day was the testimony of F. D. Guidry, president of the Terrebonne Bank, who testified with reference to the value of defendant's property. The defendant was then recalled for cross-examination by counsel for plaintiff, and after she was interrogated with reference to the time she left home and with reference to the transaction whereby she transferred her real estate to her sister, which questions she answered intelligently, defendant refused to answer any further questions. Such answers as she gave were intelligent and rational. It appears, however, that she apparently became confused in her answers by answering "yes" to the question: "Did you go to the Notary who prepared the act?" when in fact her sister had done so as was shown by the testimony of the clerk of court and her subsequent admission. This probably embarrassed her, for thereafter she was interrogated with reference

to the difference in revenues she had received from the property prior to the sale to her sister and the amount of interest she would get at 6 per cent. on the selling price of the place, to which she made no answer. But the court asked the question: "Did you understand the last question Mr. Ellender asked you"? and she answered, "Yes, I understood it," but, nevertheless, stubbornly declined to answer any more questions; whereupon the court rendered judgment pronouncing the interdiction of the defendant, assigning the following reason therefor: "Not only is she not competent to handle her own estate, but seems to be perfectly unable even to discuss it."

"To interdict is a grave, a responsible task." Francke v. His Wife, 29 La.Ann. 302, 312. "The acts of imbecility, insanity or madness must be proved to the satisfaction of the judge, that he may be enabled to pronounce the interdiction." Article 393, Revised Civil Code.

In the Interdiction of Watson, 31 La. Ann. 757, this court declined to interdict solely upon the testimony of two medical experts, because "neither of them had had opportunity to test the mental condition of the imbecile. Neither of them had ever conversed with him except during the examination of the previous day, and the opportunities for forming an opinion upon one's permanent mental condition, which often displays deceptive manifestations, were conspicuously meagre."

This court, in the case of Justus Francke v. His Wife, supra, stated that: "This court has often held in contests for money, land, or cattle, that he who only

makes out a probable case can not recover." This statement is followed by the question, "Should we depart from that rule when asked to destroy a capacity and the rights attached to that capacity; when asked to enslave the will and the functions of that will; when asked to place in charge of a curator the property, the will, the body, the privileges, and liberty of any one?" The court answered its own question, "assuredly not."

In the case at bar, we find that there is no testimony which would indicate that the defendant is mentally infirm so as to render her incapable of handling her estate and to take care of her person. While the trial judge concluded that "not only is she not competent to handle her own estate, but seems to be perfectly unable even to discuss it," he did not assign any other reason for his conclusion, except the refusal of the defendant to answer certain questions propounded to her which we have referred to hereinabove and her appearance on the stand. There is nothing in the record to indicate that the trial judge knew the defendant or had an opportunity even to observe her, except while she was attending the trial of her own case, and certainly the refusal of the witness to answer questions in itself is not recognized as a sign or proof of her insanity, particularly in the face of the testimony of the two medical experts appointed by the court, who had her under observation for some time and thoroughly examined her both with reference to her mental condition, as well as her ability to take care of her person and her property, and pronounced her sane. We, therefore,

conclude that the judgment of the lower court was unwarranted by the evidence.

For the reasons assigned, the judgment of the lower court is reversed, and plaintiff's suit is dismissed at his cost.

HIGGINS, J., takes no part.