CULPEPPER, Judge.
Mrs. Cordia O’Neal filed this suit to interdict Louis (Louie) Reeves, 80 years of age, because of his “excessive age, mental illness and senility”. From a judgment pronouncing his interdiction, the defendant appeals.
The issue on appeal is whether plaintiff has sustained her burden of proving clearly and conclusively that Mr. Reeves is mentally incompetent to care for his person and administer his estate.
We will first set forth the applicable law. LSA-C.C. Article 389 provides:
“No person above the age of majority, who is subject to an habitual state of imbecility, insanity or madness, shall be allowed to take care of his own person and administer his estate, although such person shall, at times, appear to have the possession of his reason.”
LSA-C.C. Article 424 reads in pertinent part:
“There shall be appointed by the judge a superintendent to the person interdicted whose duty it shall be to inform the judge, at least once in three months, of the state of the health of the person interdicted, and of the manner in which he is treated.”
Under these codal articles, our jurisprudence has established several principles. “Senile dementia”, a condition usually caused by cerebral arteriosclerosis in persons of old age, is recognized as one of the forms of insanity contemplated by LSA-C.C. Article 389. Pons v. Pons, 137 La. 25, 68 So. 201 (1914); Andrus v. Andrus, 136 La. 824, 67 So. 895 (1915). Also established are 3 prerequisites to the pronouncement of a judgment of interdiction: (1) The incapacity to administer one’s estate; (2) The inability to take care of one’s person; (3) An actual necessity for the interdiction exists. In re Corbin, 187 La. 968, 175 So. 636 (1937); Landry v. Landry, 171 La. 280, 130 So. 866 (1930) ; Francke v. His Wife, 29 La.Ann. 302 (1877). It is recognized that mental infirmities vary greatly in nature and degree. Hence each interdiction case must depend upon its own particular facts.
Many cases express the principle that interdiction is a harsh remedy, which should be pronounced only where the proof is very clear and conclusive. In Interdiction of Scurto, 188 La. 459, 177 So. 573 (1937) our Supreme Court approved the early case of Francke v. His Wife, supra, as follows:
“This court, in the case of Justus Francke v. His Wife, supra, stated that: ‘This court has often held in contests for money, land, or cattle, that he who only makes out a probable case can not recover.’ This statement is followed by the question, “Should we depart from that rule when asked to destroy a capacity and the rights attached to that capacity; when asked to enslave the will and the functions of that will; when asked to place in charge of a curator the property, the will, the body, the privileges, and liberty of any one?’ The court *548 answered its own question, ‘assuredly; not’”
In the recent case of Doll v. Doll, 156 So.2d 275 (La.App., 4th Cir. 1963) it was stated that courts are very reluctant to render a judgment of interdiction and that the evidence must conclusively and unequivocally prove the necessity therefor. The court said in eloquent language:
“The reason for such caution is obvious. A judgment of interdiction is, in the final analysis, a pronouncement of civil death without the dubious advantage of an inscription thereof on a tombstone.”
The general facts show that Mr. Reeves was born and raised on a modest farm in the Big Island community of Rapides Parish. He had only a sixth grade education. About 35 years ago he acquired 40 acres of land in the same area, where he built a house and lived until the last few years. He was never married. His closest relatives are certain nieces and a nephew. Up until about 6 years ago he worked on his farm, in sawmills, as a logger, for the railroad and at other jobs of this type. Now he can no longer do a “hard day’s work”. He receives a monthly welfare check.
Beginning in about 1959 he lived with various relatives and friends in the community until August of 1963, when he moved to a boarding house operated by the plaintiff, Mrs. Cordia O’Neal, where he remained until about September of 1964. For the last 8 or 10 months preceding the trial of these interdiction proceedings in June of 1965, Mr. Reeves has been living with his nephew, Mr. E. J. Ryland, in De-Ridder, Louisiana.
The events leading up to this interdiction suit began in about 1961, when oil was discovered on lands near the property of Mr. Reeves. One of plaintiff’s principal arguments is that Mr. Reeves’ mental incompetence is shown by his poor judgment and vacillations in managing his property, after it acquired mineral value. Particularly as regards- the transactions with his nephew, E. J. Ryland, who, plaintiff contends, has “slicked” Reeves out of his property. We note, before discussing these transactions, that the evidence does not show the actual value of the property conveyed, at the time.
In October of 1961 Mr. Reeves sold to Mrs. Mona Brown Ward the minerals under 10 acres of his land for $90. On March 28, 1962 Reeves conveyed to Ryland 15 acres of land, with Reeves retaining the usufruct, for $800 cash, represented by money previously loaned by Ryland to Reeves, and the assumption of a $600 mortgage. On July 25, 1962 Reeves conveyed to Ryland all minerals under 25 acres for $3,000 represented by one mortgage note, payable $600 annually.
On November 2," 1962 Mr. David Sheffield, an attorney of Alexandria, Louisiana, filed suit for Reeves and Ryland against Mrs. Ward, attacking the sale of minerals to her on the grounds that her attorney had represented he was only going to act as Mr. Reeves’ agent in leasing the property for minerals, rather than selling the minerals. On November 20, 1962 Mr. Lloyd Teekell, another attorney of Alexandria, Louisiana, filed a suit for Mr. Reeves against his nephew, Ryland, attacking the sales to Ryland on various grounds. These two suits were compromised by certain instruments under which Mrs. Ward received one-half of the minerals she had originally purchased and Ryland reconveyed to Reeves the minerals under 10 acres. This all occurred on about March 4th and 5th of 1963.
Then on March 13, 1963, and on March 14, 1963, Mr. Reeves conveyed to his nephew, Ryland, all of Reeves’ remaining land and minerals. The March 13, 1963 sale conveyed 15 acres of land with the minerals thereunder, and 1.6 mineral acres under another tract, for a stated consideration of $5 cash and $1500, represented by one note payable in three years. The *549 next day, March 14, 1963, Reeves conveyed to Ryland a very small remaining mineral interest in another piece of the property, for a stated consideration of $1 cash, with the additional stipulation that this mineral interest was actually part of that intended to be conveyed by Reeves to Ryland on July 25, 1962, in connection with which the $3,000 Vendor’s Lien and Mortgage was given.
The next development was that Reeves again employed Mr. Lloyd Teekell to file suit against Ryland, to set aside the sales made on March 13th and 14th of 1963, on the grounds of fraud, error and misrepresentation. The suit was filed August 5, 1963. But, on July 29, 1964 Mr. Reeves signed a letter addressed to Mr. Teekell requesting that his suit against Ryland be dismissed because he had reached an amicable settlement with Ryland and, in view of his advanced age, desired to bring the litigation to an end. Following this, on August 25, 1964, Mr. Reeves actually signed a receipt and release as to his demands against Ryland in said suit and filed it in the suit record. Next, Mr. Reeves filed a rule against Mr. Teekell on September 24 to show cause why he should not dismiss the suit. These interdiction proceedings by Mrs. Cordia O’Neal, prepared by Mr. Teekell, were filed on September 23, 1964.
We cannot agree that the nature of these transactions was such as to show Mr. Reeves is mentally incompetent. As noted above, the evidence does not actually show he received inadequate consideration for any of these sales. It is true he vacillated as to his feeling for his nephew, filing suit to rescind the sales to him and then asking that the suit be dismissed, etc. But Mr. Reeves testified clearly in this interdiction suit that he finally settled all his differences with his nephew and that he had conveyed all the rest of his property to him out of a feeling of gratitude for Ryland’s having taken care of him, when his other relatives showed no concern. Reeves may be using poor judgment in trusting Ryland, but he knows what he is doing and has deliberately chosen to do so. There is a vast difference between poor judgment and legal incompetence. When asked why he conveyed the last of his property to his nephew, Mr. Reeves testified:
“A Yes, I wanted to get this squared up and I wanted him to have this at my death. Other nieces and nephews wanted it and I didn’t want them to have it — none didn’t have no place for me when I got you might say out of a home — my family all died— and for that reason he done more for me and stayed with me, and helped me and helped me, and is now the last eight months. There’s where I’m making my home and intend to stay there.”
The best evidence as to Mr. Reeves’ mental condition is the expert medical testimony, which is thorough and detailed. Two specialists in psychiatry, two parish coroners with considerable experience in mental examinations, and one general practitioner testified in this case. All agreed that Mr. Reeves is not psychotic, has not suffered a stroke or other brain damage and that his diagnosis is simply one of cerebral arteriosclerosis. This means that the vessels supplying the brain with blood have become narrowed by a fatty substance building up inside, thus diminishing the supply of blood to the brain and causing the condition known as senility. The doctors explained that all persons develop this condition in their later years but, of course, the age in which it starts, and the degree to which it progresses, varies greatly with individuals. The usual symptoms are loss of memory for recent events, but not for old events, shortening of concentration span, and in more advanced cases, extreme childishness, disorientation and inability to reason.
Although the various medical experts all agree that Mr. Reeves is suffering from cerebral arteriosclerosis, there is some conflict in their testimony as to the degree *550 to which this condition has progressed. Dr. Davidson H. Texada, Jr., a specialist in psychiatry, testified that Mr. Reeves showed a good memory for things that happened in the remote past, but has difficulty in recalling recent events and in concentrating; that Reeves understood someone was trying to prove he was "crazy” and may be put in an institution; that he felt this was primarily instigated by Mr. Teekell; that Mr. Reeves could give no really clear explanation of the legal situation involving his property, but did say there were now two flowing oil wells on it, and its value was about $15,000.00. In summary, Dr. Texada thought Mr. Reeves “simply did not have the — as good a understanding of the value of the property or what was involved in it to competently handle it.” In another portion of his testimony Dr. Texada makes this statement:
“A Mentally I think he’s able to take care of his own personal needs, I think he’s capable of doing that and I would feel that Mr. Reeves is capable of handling finances on a very limited scale of a certain amount of money that’s given to him that for ordinary necessities or what not. It’s my opinion that he is not capable of handling anything that becomes involved financially.”
From this last statement by Dr. Texada, we understand him to mean that, in his opinion, Mr. Reeves was capable of handling small amounts of money, as for instance, his monthly welfare check, and using this to pay his room and board, buy his clothes and tobacco and the ordinary necessities of life. But Dr. Texada does not think that Mr. Reeves is mentally capable of handling any transaction which is legally or financially complicated.
The other psychiatrist who examined Mr. Reeves was Dr. Gillis R. Morin, of Lake Charles. Dr. Morin testified Mr. Reeves was correctly oriented as to time, place and person; that he explained the reason for his mental examination by saying “they’ve got some lawsuit trying to say that I’m insane. My nephew that came with me has treated me fine for years and has taken care of me and I willed him a little piece of property.”; that his memory for recent events was somewhat cloudy but for remote events was good; that his general fund of knowledge was in keeping with his schooling and mode of life; that his thought processes were coherent, relevant and goal-directed; that his predominant mood was cheerful and his personality and relationships with other people was normal. Dr. Morin’s conclusion was:
“Although there are some signs of chronic brain syndrome I do not feel Mr. Reeves is incompetent. His mind is still amazingly clear for a person his age and the only evidence of psychopathology is the cloudiness of his recent memory. In my opinion he is certainly capable of signing any papers and would know what he is doing.”
Dr. Walter Murrell, a general practitioner and coroner of Rapides Parish for many years, summarized his testimony as follows:
“A Well I believe he could come and go at will, go home, come to town, transact any business buying articles, or selling articles, or making decisions on clothing, and any of his usual activities. He could go out on a farm and gather up eggs, or gather vegetables, milk the cow, feed the animals- — if that’s his usual activities that’s what I would think he would be able to do the day I examined him.
“Q You were not referring to his ability to transact business? Sell property, etc.”
“A He could have sold property this past Monday — he was clear, he was oriented, he knew where he was, he knew the place, he knew the time of day, he knew who he was, he knew who I was, he was oriented as we say in all three spheres. He was able when I examined him Monday to perform his usual activities.”
*551 Dr. Luke Marcello, a general practitioner and coroner of Beauregard Parish, testified unequivocally that Mr. Reeves was mentally competent to care for his person and administer his estate. For instance, Dr. Marcello said:
“Well, to me, I think for a man of his age he really struck me as being pretty clear. Of course I know that different individuals may vary in their reactions as they get older; some individuals may have some symptoms earlier, but for a man his age I think he responded well. I think he — he didn’t hesitate and he was clear in his speech and clear in his thinking.”
Dr. Edward A. Norton, a general practitioner of Alexandria, Louisiana, who was Mr. Reeves’ personal physician for several years, expressed the opinion that he was incompetent to manage his affairs and his person. Dr. Norton testified:
“On my ten or twelve years association with him, talking over with him, I don’t believe he was definite — to be able to comprehend legal things or difficult things, simple things probably yes, I think he would err in judgment more likely than not, very seriously probably at times.”
But, a closer reading of Dr. Norton’s testimony will show that he thinks our courts should be very liberal, instead of very strict, in pronouncing interdiction of the aged. Dr. Norton was of the opinion that when he first started treating Mr. Reeves in 1954 he was incapable of managing his business affairs. This doctor is of the view that there are very few people past 80 years of age who are capable of taking care of their affairs. Of course, this liberal philosophy on interdiction is contrary to the very strict requirements established in our jurisprudence, as set forth above.
Summarizing the expert medical testimony, it clearly preponderates that Mr. Reeves is mentally capable of caring for his person and managing his affairs.
Let us now consider the lay testimony. Mr. Edwin O. Ware, attorney at law of Alexandria, who passed the act of sale from Reeves to Ryland on March 28, 1962, testified that at the time he passed this conveyance he was of the opinion Mr. Reeves understood the transaction and was competent. But, as a result of subsequent conversations with Mr. Reeves and the subsequent actions of Mr. Reeves in attempting to set aside the sales to Ryland, Mr. Ware finally concluded he was too senile to handle his own business.
However, Mr. C. O. Brown, an attorney of Alexandria, who handled the mineral sale from Reeves to Mrs. Ward in 1961, Mr. David A. Sheffield, an attorney of Alexandria, who handled the sale from Reeves to Ryland on July 25, 1962, Mr. Field V. Gremillion, an attorney of Alexandria, who handled the sales from Reeves to Ryland on March 13 and March 14, 1963, and Mr. Jess Funderburk, an attorney of Leesville, Louisiana, who drew the request for dismissal of Reeves’ suit against Ry-land, all expressed the opinion that Mr. Reeves understood the nature of these various transactions and that he was mentally competent to sign them.
Mr. Lloyd Teekell, attorney for the plaintiff in these interdiction proceedings, testified that he thought Mr. Reeves was competent when he filed and later compromised the first suit for Reeves against Ry-land in the early part of 1963. But Teek-ell later became convinced that Reeves is incompetent after Reeves sold the remainder of his property to Ryland; shortly thereafter asked Teekell to file suit to set the sales aside; and then, within a few months came back and requested the suit be dismissed. We might state here that we, like the trial judge, think Mr. Teekell is perfectly sincere in his belief and has no motive but to protect the interests of Mr. Reeves.
*552 Other lay witnesses for the plaintiff were Mr. and Mrs. Newton J. Paul, neighbors and friends of Mr. Reeves for many years, with whom Mr. Reeves actually lived for a year or so; Mrs. Cordia O’Neal, the plaintiff in these interdiction proceedings, in whose boarding house Mr. Reeves lived from about August of 1963 to September of 1964; and Mr. Leroy L. Teddlie, another boarder in Mrs. O’Neal’s home while Mr. Reeves lived there. These witnesses testified generally that Mr. Reeves was very forgetful; that he would lose his tobacco, his knife and his clothes; that he couldn’t remember things he had done that same day; that he had a kidney ailment and couldn’t control his urine and hence often wet his pants, causing them to have a bad odor. They expressed the opinion that Mr. Reeves did not have enough reason and judgment to manage his property.
On the other hand, the defendant introduced the testimony of Mrs. J. W. Bradford, who has known Mr. Reeves all of her life; Mrs. Annie Ryder, who also has known Mr. Reeves for many years; Mr. Roy Ryland, a relative of Mr. Reeves; Mrs. Pat Belgard, a lady 82 years of age who has known Mr. Reeves all of her life. These witnesses testified generally that Mr. Reeves was alert for his age and was mentally capable of understanding and managing his own business affairs. Also, Mr. Frank Jenkins, who has known Reeves for many years and took a mineral lease from Reeves in 1962. Jenkins says Reeves was competent in 1962 but that he is older now and in view of this litigation over his competency, he would not lease from him now.
In our opinion, the testimony of the lay witnesses, other than the attorneys, is of very little value. This testimony merely depicts an elderly gentleman, sometimes forgetful and lacking in the ability to understand complicated legal matters. But, such testimony is clearly not sufficient to support a judgment of interdiction.
This case is very similar to In re Talia-ferro, 231 La. 394, 91 So.2d 578 (1956). There, a son sought to interdict his mother, who was 83 years of age. After moving to the home of her daughter, she conveyed certain valuable oil producing property, cash and other properties to the daughter. The son contended that the acts of his mother were irrational, and two lay witnesses, both bankers, expressed the opinion that Mrs. Taliaferro was incapable of managing her business affairs, principally because she was uneducated and could not count large sums of money and had no idea about values. However, two expert medical witnesses found Mrs. Taliaferro well oriented, alert and capable of understanding and managing her affairs. A Mr. Flowers, attorney who handled the conveyance to the daughter, said Mrs. Taliaferro understood the nature of the transactions and that her purpose and intent was to leave her daughter everything and her son nothing. The court concluded:
“When consideration is given to the testimony of Mr. Flowers the circumstances referred to by appellee’s counsel do not clearly establish mental incompetence of defendant to manage her estate. At the most they indicate that she, by her acts, was merely attempting to prefer her daughter over her son.”
In Re Taliaferro, supra, the court noted particularly that Mrs. Taliaferro’s testimony during the trial was coherent and responsive and pointed to an understanding of the transactions in question. In reversing the lower court and setting aside Mrs. Taliaferro’s interdiction, our Supreme Court called attention to one of its earlier cases as follows:
“With further reference to the testimony of the defendant, certain language of this court in Delord v. Lozes, 144 La. 377, 80 So. 595, 596, seems appropriate. Therein, in reversing a district court finding that a 76 year old woman was mentally deficient, we said: ‘ * * * She was called to the witness *553 stand by counsel for the other defendants and cross-examined at length, to test her mental faculties; and her answers, though not always accurate, were generally and in most part correct. Every answer was responsive and appropriate. We think that the relevancy of the answer to each question propounded — not an inaccuracy or error here and there — is the best test of the mental condition of the witness. The evidence shows that Miss Lozes is 76 years of age and of very unassuming disposition, having spent the better part of her life in her home, taking little or no interest in what went on outside, and looking mainly to her sister, the plaintiff here, for the management of her financial affairs. It does not appear that she is not capable of taking care of her personal affairs. * * ’ ”
In the present case, the testimony of Mr. Reeves, although not always perfectly accurate, is responsive, appropriate and goal-directed. For instance, in addition to the above quotation from his testimony, we quote the following as illustrative:
“Q You understand that this suit is an interdiction suit against you to declare you incompetent — can you understand that?
“A Yes, sir. Those parties don’t want my nephew to have nothing and they have done nothing for me and he’s stuck to me all the way through — give me a place to stay, fed me, money, do anything he can do for me, and it’s —it looks like there’s a dozen of them wanting what I’ve got — trying to get it for nothing. There’s men and women involved in this now. If a man gets to — I don’t care who it is, working to try to beat some old broke down person out of what they come by honest, there ain’t much to them — very little to a man that will try to rob an old broke down man — I don’t care who he is or where he come from. And I’m just the old boy that will tell him how sorry he is.”
We can come to no other conclusion but that the plaintiff has failed to prove clearly and conclusively, as is required under our established jurisprudence, that Mr. Reeves is unable to care for his person or manage his estate. As is noted in the above cited cases, the interdiction of a person is a very grave and serious responsibility. The effect of such a judgment would be that, not only the property, but the very will, the body, the privileges and the liberty of Mr. Reeves would be placed in charge of a curator. His curator could tell him where to live, how to spend his money and where he could go. Mr. Reeves couldn’t even sign a will bequeathing his property. The evidence here simply does not clearly show that Mr. Reeves’ condition requires such supervision.
For the reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of Mr. Louis (Louie) Reeves and against the plaintiff, Mrs. Cordia O’Neal, dismissing this suit for interdiction. All costs in the lower court, as well as the costs of this appeal, are assessed against the plaintiff appellee.
Reversed and rendered.