209 So.2d 363 (1968)
In re Interdiction of Margaret C. ADAMS.
No. 2917.
Court of Appeal of Louisiana, Fourth Circuit.
April 8, 1968.
Rehearing Denied May 6, 1968.
*364 Adams & Reese, Edward J. Rice, Jr., New Orleans, for plaintiff-appellee.
Robert L. Atkinson, III, New Orleans, for defendant-appellant.
Before REGAN, SAMUEL and CHASEZ, JJ.
SAMUEL, Judge.
Mrs. Elizabeth Adams Harrison filed this suit to interdict her aunt, Miss Margaret C. Adams, who was approximately 89 years of age. After trial there was judgment pronouncing the interdiction. The defendant has appealed.
The litigants are in agreement as to the applicable law and jurisprudence. LSA-C.C. Art. 422 provides, inter alia, that "* * * all persons who, owing to any infirmity, are incapable of taking care of their persons and administering their estates * * *" are liable to be interdicted. The jurisprudence recognizes that, since mental infirmities vary greatly in nature and degree, each interdiction must depend upon its own particular facts; interdiction is a harsh remedy and should be pronounced only where the proof is clear and conclusive; and there are three prerequisites to the pronouncement of a judgment of interdiction: (1) incapacity to administer one's estate; (2) inability to care for one's person; and (3) an actual necessity for the interdiction. Francke v. His Wife, 29 La.Ann. 302; Interdiction of Watson, 31 La.Ann. 757; Calderon v. Martin, 50 La.Ann. 1153, 23 So. 909; Andrus v. Andrus, 136 La. 824, 67 So. 895; Pons v. Pons, 137 La. 25, 68 So. 201; In re Corbin, 187 La. 968, 175 So. 636; Interdiction of Scurto, 188 La. 459, 177 So. 573; Interdiction of Taliaferro, 231 La. 394, 91 So.2d 578; Interdiction of Reeves, La.App., 187 So.2d 546.
The question presented is whether there is sufficient evidence to justify the judgment.
Miss Adams is a former school teacher who has never married. Her closest relatives are three nieces, daughters of a deceased brother, one of whom is the petitioner who lives in Baton Rouge. As shown by the inventory contained in the record the defendant's estate has a total value of $228,562.26, principally in corporate stocks and real estate. Defendant also receives regular payments from the Teachers Retirement Fund.
Miss Adams owns a large home on St. Charles Avenue in the City of New Orleans. She lived in that home for many years with a close friend, Miss Josephine Echezebal. Following the latter's death approximately five years before this suit was instituted, Miss Adams resided alone for some time assisted by a succession of maids. Later she was assisted by a succession of ladies who slept on the premises but worked elsewhere during the day. Thereafter, she has continued living in the home without assistance from any one.
Several months prior to the filing of this suit Miss Adams had been contacted by a man who represented himself as being an employee of the Sewerage & Water Board. He told her he had lost his home and possessions in a hurricane and, because of concern about what the Sewerage & Water Board might do to her, she agreed to allow him to stay in her home. Later he brought two other men, whom he told defendant were a friend and a nephew, to live on the premises. Miss Adams regretted her decision permitting these strangers to live in her *365 home and talked about the matter to a friend or friends who ultimately advised her relatives.
Petitioner had not seen her aunt over a period of years. But upon receiving the information regarding the strangers in Miss Adams' home she visited her aunt accompanied by an attorney and a detective. Later that day petitioner obtained a coroner's commitment and brought Miss Adams to DePaul's Hospital, a sanitarium in the City of New Orleans, where she has remained. This suit for interdiction then was instituted.
A total of eight witnesses testified at the trial; four were called by petitioner and four were called by the defendant. Testifying on behalf of petitioner were: Mrs. Harrison, the petitioner; Dr. Sam Hobson, a specialist in internal medicine and the defendant's personal physician for many years; Dr. Benjamin F. Parker, a psychiatrist who was appointed by the trial judge to examine the defendant and report to the court as to her mental state; and Dr. Kenneth A. Ritter, also a psychiatrist. Testifying for the defense were: Dr. Charles R. Smith, a psychiatrist; Dr. William C. Super, also a psychiatrist; Mrs. Lillian B. Fritzwilson, the defendant's close personal friend of many years; and the defendant, Miss Adams.
Mrs. Harrison testified that when she went to her aunt's home in the company of her attorney and a detective, the door was opened by a man who looked like a tramp. Another man was downstairs and a third, not fully clothed, was upstairs. She found Miss Adams locked in her room taking a nap. The house was in a state of general disorder. She spoke with her aunt and asked her about the men. Miss Adams told her they represented the City of New Orleans and that she was afraid of them. When she brought her aunt to the sanitarium the defendant threatened suicide. Petitioner and her party then returned to the house and evicted the three men. Upon searching the house she found eight or nine checks; one over a year old, and an overdue utilities bill.
Dr. Hobson testified he had known and treated the defendant for at least fifteen years. With the exception of the six weeks immediately prior to the commitment, during the preceding two years he saw her whenever she would telephone him which occurred at least once and occasionally twice each month. During the last two or three years her health has not been as good as it had been previously. She is forgetful and her memory at times is poor. On some occasions she complained her house had been entered by men and she had to change locks on the doors. On other occasions she told this doctor the druggist had not delivered medicine she had been ordered to take; but when he checked with the drug store the doctor had been informed she had refused to accept delivery of the medicine. While Dr. Hobson felt she was in good health for a woman of her age, he did not feel she was capable of running her household, cooking her meals or paying her bills. He suggested several times that she go to a hospital or a nursing home but she refused to do so. He signed the request for a coroner's commitment as her physician because he felt Miss Adams needed to be taken care of and was unable to do so herself. He has seen her four to five times since the commitment. The day before the trial he found her ambulatory and able to care for her personal hygiene. While he doubted her ability to nourish herself properly, he felt if she had someone to look after her in every respect she could live wherever she wanted. He was also of the opinion she could be cared for in a nursing home and felt her care at DePaul's was being handled in a very satisfactory manner. He stated she had threatened suicide on several occasions.
Dr. Parker examined the defendant on twenty occasions, first during the three days following the commitment and three to four times each week thereafter. She was distraught but communicated, although there was much rambling in her conversation and difficulty in coming to a final point in any *366 discussion. She talked at length about having been contacted by the Sewerage & Water Board employee who moved into her home with two other men. She also spoke at length and was quite moved over people who were fond of her, stating many men were in love with her including doctors and others. His diagnosis was that Miss Adams was senile with chronic brain syndrome or cerebral arteriosclerosis; her remote memory was good but her recent memory inadequate. He felt she was in need of care and supervision and was unable to care for herself, her property or her business affairs. At the present time she is in the geriatric ward at DePaul's with people in similar conditions under twenty-four hour supervision where her nutrition, hygiene and comfort are cared for. He felt that compared to the program at DePaul the existing nursing homes in the area were inadequate and could not properly care for Miss Adams and that it would be difficult for her to live in a private home or apartment with the aid of a nurse or friend as her condition could be expected to deteriorate. He found her in need of medical supervision and outspoken against it. She stated to this doctor that if not released she would do away with herself.
Dr. Ritter testified he saw Miss Adams on two occasions following her commitment. She was suspicious with an aloof grandiose air. She believes she is being persecuted, does not know she is in a hospital and thinks she is in jail. Her memory for past events is much sharper than it is for recent events. She shows agitation, wide mood swings and bizarre behavior, threatening suicide casually. His diagnosis was chronic brain syndrome due to senility and manifested by paranoid misinterpretation, delusions of persecution, grandiosity, bizarre amorous behavior, memory defects, agitation, emotional instability and lack of insight. He found her incapable of taking care of her person, cooking for herself, running her house, or managing her personal affairs. At the present time she is assigned to a private room in a ward with other persons who are ambulatory and come to meals. The patients are closely supervised, taken for group walks, have nutritious meals, adequate facilities and recreation. The place is clean and well kept and the nurses and other personnel are well trained to handle elderly people. The doctor stated he is familiar with the nursing homes in this area but believes if she were placed in one she would immediately demand her release which the home would have to grant. Although he thinks she is capable of living at home, this would require a companion to act as a guardian.
Dr. Smith examined the defendant on two occasions following commitment. He concluded she has chronic brain syndrome with some intellectual deviations to be expected with some people in her age group, some recent memory loss and some instability of emotions with wide mood swings. Her judgment shows variations but within her ability she is able to communicate. While many of her ideas are eccentric and bizarre, she retains a remarkable amount of intellectual functions within limits. Her behavior has been questionable and there is evidence of a traumatic or grandiose or extensive unusual outlook but this is not constant. He found her obviously senile, but her type of intellectual deterioriation is one ordinarily seen in a person of her age; it does not appear to be extraordinary considering her age. He was of the opinion there was no necessity for hospitalization because there is no psychiatric treatment for her condition. But he was also of the opinion that she needs a companion; if she has a competent companion she could function as well in her own home or in a nursing home. While she has a memory loss and an impairment of reasonability, she is capable of handling her own affairs provided she recognizes the fact that she has memory trouble.
Dr. Super testified he examined defendant on two occasions following her commitment. He found she had chronic brain syndrome (arteriosclerosis) associated with paranoid reaction, a senile brain disease together *367 with psychotic condition. However, her degree of disorder was not appreciably more than one would find in many persons of advanced age and he felt it was not sufficiently severe to make it impossible for her to be aware of her own legal and financial affairs and to handle them herself as her mental disorder did not sufficiently interfere with this capacity. She had some memory troubles, particularly with regard to current events but he did not feel this deficit in memory would affect the ability to handle her affairs. He thought she was aware of what her estate consisted of. She did have fantasies about various men being in love with her as have a number of maiden ladies he has attended. He felt she was as capable of taking care of her person and her dress as do many patients at Charity Hospital, but because of her financial condition she is able to be attended at DePaul rather than a charitable institution. The doctor stated that if these patients calm down sufficiently and "have a relatively good home situation" they try them outside the hospital again, especially if it is their first admission. In the defendant's case he felt she should have another try at being out in the community before he considered she would need to be hospitalized indefinitely.
Mrs. Fritzwilson testified Miss Adams had been one of her closest friends and a neighbor for many years. Over a long period of time she visited the defendant at the latter's home twice weekly and often spoke to her over the telephone. She always found Miss Adams to be normal and rational in every respect with no memory problems. Although this witness knew nothing about the defendant's financial affairs or her ability to administer her estate, she was of the opinion Miss Adams could stay in her own home with a nurse or housekeeper. We note that Mrs. Fritzwilson moved from the neighborhood in which Miss Adams lived some years prior to the trial and her testimony is not clear as to how recently she has visited with Miss Adams prior to the commitment. She did not know of the commitment until informed of the fact by other persons approximately one month after the event had taken place.
We find it difficult to discuss the testimony of Miss Adams because it is confusing and most frequently not in point. Even considering the strain she must have been under as a result of being in court and testifying in a case vitally affecting her own future, her testimony tends to support the findings of the doctors who appeared for the petitioner. She failed to understand many simple questions and her answers generally were rambling and unresponsive. She appeared to know very little about her estate or her financial affairs.
Because of the nature of this proceeding and while the case was under advisement after a full hearing thereon, the trial judge went to DePaul's and spoke to Miss Adams at length. That conversation, a report of which he dictated into the record, was devoted chiefly to the defendant's understanding and appreciation of her estate, together with her ability to administer the same. After the conversation he reopened the matter for another hearing to permit the taking of additional testimony.
We are satisfied that the proof contained in the record is sufficiently clear and conclusive so as to justify the judgment of interdiction. There can be little doubt that Miss Adams is incapable of administering her estate. And we must conclude that she is unable to care for her person. The prerequisite of inability to care for one's person encompasses more than the capacity to perform some household duties, properly robe and disrobe one's self, and conduct one's self at the meal table (see Landry v. Landry, 171 La. 280, 130 So. 866). A normal seven year old child is capable of doing those things. Here, only with the exception of Dr. Parker, all of the medical testimony, and even the testimony of Mrs. Fritzwilson, is that Miss Adams could reside outside of a sanitarium in a nursing home or in her own home provided she had constant competent help from a nurse or companion; Dr. Parker felt she needed more than just a nurse or *368 companion. We must conclude that her needs, including nutrition, general medical care, safety and comfort could be met only by such supervision and care as a minimal requirement. This points out not only the inability to care for one's person, but also the actual necessity for the interdiction. For Miss Adams does not have such help, nor is she likely or willing to obtain the same. She does not have what Dr. Super referred to as a "relatively good home situation" to which she can return. Indeed, other than a large house in which she lives alone, she has no home at all. As she has refused to enter a nursing home and as it is clear that no nursing home will accept or keep her without her full and voluntary consent, it is apparent that the sanitarium is the only answer and interdiction is a necessity. We reach this conclusion with the reluctance present in the cases in which a judgment of interdiction is rendered.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.